AEP Energy Services Gas Holding Company v. Bank of America, NA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: September 29, 2009          Decided: October 29, 2010)

Docket Nos. 08-4196-cv (L); 08-4671-cv (XAP)[*]

--------------------------------------

AEP ENERGY SERVICES GAS HOLDING COMPANY, HOUSTON PIPE LINE
COMPANY LP, HPL RESOURCES COMPANY LP,

Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees,

- v -

BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT, AS MASTER SWAP
COUNTERPARTY, AS SECURED PARTY, AND AS PURCHASER, THE BANK OF NEW
YORK, AS TRUSTEE OF THE BAMMEL GAS TRUST,

Defendants-Counterclaimants-Appellees-Cross-Appellants.

--------------------------------------

Before:    JACOBS, Chief Judge, SACK and LYNCH, Circuit Judges.[**]

Appeal from a summary judgment entered by the United

States District Court for the Southern District of New York

(Thomas P. Griesa, Judge) in favor of the defendants.  The

plaintiffs, AEP Energy Services Gas Holding Company, Houston Pipe

Line Company, and HPL Resources Company, brought several claims

for declaratory and other relief against the defendants, Bank of

America, N.A. and the Bank of New York, seeking to establish a

---

[*] 08-4671-cv (XAP) has been withdrawn by stipulation filed
January 7, 2009.

[**] At the time of oral argument, Judge Lynch was a United
States District Judge for the Southern District of New York,
sitting by designation.  He has since joined the Court.

right superior to the defendants' to use certain reserves of natural gas and related assets in which Bank of America claimed a vested security interest. Bank of America counterclaimed for conversion, breach of bailment agreement, and replevin, alleging a superior secured interest in the gas, which interest had been infringed when the plaintiffs refused to relinquish possession of the gas upon Bank of America's demand. The district court (Thomas P. Griesa, <u>Judge</u>) granted summary judgment in favor of the defendants on all of the plaintiffs' claims and on Bank of America's conversion-related counterclaims, as to which it awarded damages to Bank of America in excess of $345 million. The district court also denied the plaintiffs' motions to amend the complaint and to defer ruling on the summary judgment motions, which were made during the pendency of summary judgment proceedings. The summary judgment for the defendants is vacated with respect to the plaintiffs' non-declaratory claims. The district court's judgment is affirmed in all other respects.

Affirmed in part; vacated in part.

IRA M. FEINBERG, Hogan & Hartson, LLP (Jenny Rubin Robertson, Toby W. Smith, <u>of counsel</u>; David Dunn, Frank T. Spano, <u>on the briefs</u>) New York, N.Y., <u>for Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees</u>.

AARON RUBINSTEIN, Kaye Scholer LLP (Robert Grass, W. Stewart Wallace, Lee M. Cortes, Jr., <u>of counsel</u>; Margot B. Schonholtz, Jeffrey A. Fuisz, <u>on the briefs</u>), New York, N.Y., <u>for</u>

2

SACK, Circuit Judge:

This action stems from a dispute over the rights to natural gas stored in the Bammel Gas Storage Facility, an underground gas reservoir located in Texas. The plaintiffs, AEP Energy Services Gas Holding Company ("AEP"), Houston Pipe Line Company LP ("HPL"), and HPL Resources Company LP ("HPLR") (hereinafter sometimes collectively the "plaintiffs") entered into a complex series of transactions with Enron Corporation or affiliates thereof (hereinafter collectively "Enron"), Bank of America, and the Bank of New York with respect to the right to use certain natural gas and assets contained in the Bammel Gas Storage Facility. The Bammel Gas Storage Facility is owned by the Bammel Gas Trust, a special-purpose entity formed and owned in equal part by Enron and Bank of America, of which the Bank of New York is Trustee.

After Enron entered bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York in December 2001, Bank of America and the Bank of New York attempted to repossess the gas contained in the Bammel Gas Storage Facility, purportedly pursuant to the terms of the operating agreements among the parties. The plaintiffs refused. Instead, they brought suit against the two banks in the United States District Court for the Southern District of Texas (the "Texas District Court") alleging a superior right to continue to

3

use the gas. Bank of America responded by counterclaiming against the plaintiffs for conversion, breach of bailment agreement, and replevin, asserting a superior secured interest in the gas that had vested upon Enron's bankruptcy. Following the approval by the Bankruptcy Court of a settlement agreement among Enron, Bank of America, and the Bank of New York relating to the Bammel Gas transaction at issue in this appeal, the Texas District Court severed the plaintiffs' declaratory claims from their non-declaratory claims, which were based on tort and contract theories, and transferred the declaratory claims, and Bank of America's related counterclaims, to the United States District Court for the Southern District of New York (the "New York District Court"). The Texas District Court retained the plaintiffs' non-declaratory claims and Bank of America's related counterclaims.

Upon this transfer, over the plaintiffs' objections and contrary to the express intention of the Texas District Court, the New York District Court adjudicated the entire controversy, including the non-declaratory claims and counterclaims that had been retained by the Texas District Court. Then, in a series of rulings, the New York District Court granted defendant Bank of America's motion for summary judgment as to both the plaintiffs' declaratory claims and non-declaratory claims, and Bank of America's counterclaims, and awarded damages to Bank of America on its counterclaims in the amount of $345,675,000 plus prejudgment interest. At the same time, the district court

4

denied the plaintiffs' motions filed during the pendency of the summary judgment proceedings to amend the complaint and to postpone a decision on the summary judgment motions in order to permit the conduct of further depositions.

We agree with the district court with respect to the grant of summary judgment as to the declaratory claims and related counterclaims, which had been properly transferred by the Texas District Court to New York, and as to the denial of the plaintiffs' motions to amend and to allow them to take further depositions. We conclude, however, that adjudication of the non-declaratory claims by the New York District Court was an abuse of discretion. The Texas District Court -- in which the claims were first filed -- expressed a clear intention to retain the non-declaratory claims and no special circumstances were present to outweigh the presumption in favor of the first-filed jurisdiction; therefore, the New York District Court should have declined to consider them. Having so determined, we vacate the summary judgment with respect to the non-declaratory claims, which we conclude should be adjudicated in Texas.

**BACKGROUND**

The relevant facts are rehearsed in detail in the district court's four lengthy and careful opinions in this case. See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 2007 WL 2428474, 2007 U.S. Dist. LEXIS 63421 (S.D.N.Y. Aug. 28, 2007) ("AEP I"); AEP Energy Servs. Gas Holding Co. v. Bank of Am.,

5

<u>N.A.</u>, 2007 WL 4458117, 2007 U.S. Dist. LEXIS 93022 (S.D.N.Y. Dec. 18, 2007) ("<u>AEP II</u>"); <u>AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.</u>, 2008 WL 925433, 2008 U.S. Dist. LEXIS 30587 (S.D.N.Y. Apr. 2, 2008) ("<u>AEP III</u>"); <u>AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.</u>, 2008 WL 3338203, 2008 U.S. Dist. LEXIS 61264 (S.D.N.Y. Aug. 11, 2008) ("<u>AEP IV</u>"). They are set forth here only insofar as we think it necessary for an understanding of our resolution of this appeal. We construe the evidence in the light most favorable to the plaintiffs, as the non-moving parties, and draw all reasonable inferences in their favor. See, e.g., SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).

### The 1997 Transaction

In November 1997, Enron,[1] in an effort to generate off-balance-sheet capital before the end of the year, entered into a series of interrelated agreements (the "Operative Agreements") with Bank of America ("BofA") and the Bank of New York as trustee ("BONY" or the "Trustee"), among other entities, to monetize the natural gas owned by Enron's then-wholly owned subsidiary HPL. At that time, HPL owned and operated an underground natural gas storage reservoir in Harris County, Texas, called the Bammel Gas Storage Facility (the "Storage Facility"). HPL and its own subsidiary, HPLR, owned approximately 80 billion cubic feet

---

[1] Some of the transactions discussed in this opinion were undertaken by affiliates or subsidiaries of Enron Corporation. For ease of reference, we refer throughout to all of these entities collectively as "Enron."

("Bcf")[2] of natural gas kept in the Storage Facility (the "Storage Gas").

In order to achieve its goal of off-balance-sheet financing, Enron and BofA's predecessor in interest in this transaction, NationsBank, N.A.,[3] created the Bammel Gas Trust ("BGT" or the "Trust"), a special-purpose entity that was owned in equal parts by the two entities. BONY was designated to act as the Trustee of BGT.

Following the creation of BGT, Enron caused HPL and HPLR to sell the Storage Gas to BGT for a purchase price of $232 million. The sale was pursuant to a Storage Gas Sale Agreement, which stated, among other things, that the agreement would "serve as a bill of sale for the Storage Gas without the necessity of having any separate bill of sale or other evidence of the transfer of the Ownership of the Storage Gas" from HPL to BGT, and that BONY, as Trustee of BGT, would be "deemed to have taken delivery of the Storage Gas" as of the date of purchase. Storage Gas Sale Agreement dated December 30, 1997 ("1997 Sale Agreement") §§ 2.03, 2.04, Exh. H to the Declaration of Aaron Rubinstein in Support of Defendants' Motion for Summary Judgment

---

[2] Another measure of natural gas quantity, which is used in the transaction documents and will be referenced in this opinion, is "MMBtus." The technical distinction between these two measures is not relevant to our discussion or resolution of the issues on appeal. Suffice it to say that 80 Bcf of natural gas is approximately equivalent to 80,000,000 MMBtus.

[3] Bank of America acquired NationsBank through a merger in 1998. For convenience, all Bank of America affiliates involved in this transaction are hereinafter referred to collectively as "Bank of America" or "BofA."

("Rubinstein Decl."), AEP Energy Gas Servs. Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Aug. 28, 2006). See generally Participation Agreement dated December 30, 1997 ("1997 Participation Agreement"), Exh. A to Rubinstein Decl.

To fund this purchase, BofA (through its affiliate, Kitty Hawk Funding) loaned BGT approximately $218 million, and BofA and Enron each injected approximately $7 million of equity into BGT, with Enron's equity contribution also financed by BofA.[4] As collateral for the loan, BONY, the Trustee of BGT, granted BofA a security interest in all of the assets held in the Trust, including the Storage Gas, pursuant to a Security Agreement. See Security Agreement dated December 30, 1997 ("1997 Security Agreement") § 3, Exh. B to Rubinstein Decl.

Concurrently with this transaction, BGT granted HPL and HPLR continued use of the Storage Gas and the Storage Facility under a Pressurization and Storage Gas Borrowing Agreement (the "Pressurization Agreement") in exchange for the payment of "pressurization fees" to BGT, which BGT then used to pay the interest on the BofA loan. Pursuant to this agreement, HPL and HPLR could use the Storage Gas to pressurize the Storage Facility, in order to facilitate the storage and withdrawal of other customers' natural gas; HPL and HPLR could also borrow and

---

[4] BofA later syndicated $229 million of the loan to six other banks. BofA serves as the representative of BONY (the Trustee of BGT) and as the Administrative Agent for the other banks.

withdraw up to a certain quantity of the Storage Gas for other working uses, subject to replacement.

The Pressurization Agreement provided that title to and ownership of the Storage Gas remained with the Trustee until such time as the Storage Gas was either withdrawn and sold by the Trust or borrowed by HPL. The Pressurization Agreement also provided that beginning in 2004 (when the loan principal was due to be repaid to BofA), HPL was obligated to withdraw the Storage Gas from the facility and make it available to BGT in accordance with a "Withdrawal Schedule." Enron was then obligated to sell that gas pursuant to a Marketing Agreement and to pay to BGT the Houston Ship Channel Index price[5] for the gas, irrespective of the price that Enron actually received from the sale. The proceeds from this sale were to be applied by BGT to repayment to BofA of the principal of the loan.

HPL also had the option under this agreement, instead of withdrawing the Storage Gas to be sold pursuant to the Withdrawal Schedule, to supply Enron with "Exchange Gas" of equivalent quality and value to be sold by Enron pursuant to the Marketing Agreement to fund BGT's repayment of the BofA loan, and thereby to continue to use the Storage Gas in the Storage Facility after the 2004 withdrawal date.

---

[5] The Houston Ship Channel Index lists the price at which natural gas is being sold in the Houston Ship Channel at a particular point in time. It is generally regarded as reflective of the prevailing market price of natural gas.

In addition, through a Performance Guaranty (the "Guaranty"), Enron guaranteed all the obligations of its subsidiaries, including HPL and HPLR, under the Operative Agreements. The Guaranty provided that in the event of a "Guaranty Default," the Trustee had the right to immediate possession of the gas. A Guaranty Default was deemed to exist to the extent that, inter alia, "[a]ny representation or warranty made by Enron under or in connection with this Guaranty shall prove to have been incorrect in any material respect when made and such materiality is continuing" or "Enron or any of its Principal Subsidiaries shall become the subject of a Bankruptcy Event." Performance Guaranty dated December 30, 1997 ("1997 Guaranty") §§ 5.01(a), 5.01(c), Exh. E to Rubinstein Decl.

Although BGT nominally owned the Storage Gas and the Storage Facility following this transaction, HPL and HPLR's right to use the sold assets continued uninterrupted except for (1) the payment from BGT to HPL for the purchase of the Storage Gas and the Storage Facility, (2) fees paid by HPL to BGT for the use of the Storage Gas and the Storage Facility, and (3) the fact that Enron could now book this as a "sale" for year-end-revenue accounting purposes. In effect, the transaction functioned similarly to a sale and leaseback of the gas.

## The 2001 Transaction

In 2000, Enron decided to sell HPL.[6] However, for its own accounting advantage, it wanted to keep the existing off-balance-sheet structure in place. AEP expressed interest in purchasing HPL outright, but Enron was unwilling to unwind the 1997 transaction structure in order to make the sale of HPL to AEP.

In May 2001, Enron and AEP settled on the following transaction structure: Enron created a new subsidiary, BAM LeaseCo ("LeaseCo"), which assumed all of the rights and obligations of HPL under the Operative Agreements, as well as specified assets of HPL, pursuant to an Assignment and Assumption Agreement. Thus LeaseCo effectively stepped into the shoes of HPL with respect to its transaction with BGT, freeing HPL of these rights and obligations. AEP then bought HPL. Soon after, HPL bought approximately 25 Bcf of gas back from BGT for $94 million. BofA thereafter agreed to release its security interest in this gas. That left BGT with title to only 55 Bcf of Storage Gas, and BofA with this same amount of Storage Gas as secured

---

[6] Prior to this, in November 1999, there was another transaction in which HPL entered into a second sale-leaseback arrangement with another Enron-formed special purpose entity named Asset Holdings, L.P. ("Holdings"), in which HPL effectively sold its interest in the Storage Facility and other equipment and assigned its obligations under the Pressurization Agreement to Holdings, and Holdings then leased these assets back to HPL. Holdings was thus among the interested parties in the 2001 restructuring, along with HPL. Because the transaction between Holdings and HPL does not materially affect the issues on appeal, however, for purposes of our description of the 2001 Transaction it will be largely ignored.

11

collateral for the loan.  LeaseCo then subleased the Storage Facility and associated pipelines and equipment back to HPL for a term of thirty years (with a further twenty-year option), for which AEP prepaid the rent of $274 million to LeaseCo.

Additionally, under a "Right To Use Agreement," LeaseCo granted HPL "quiet enjoyment" of the Storage Gas for the entire term of the sublease.  Specifically, section 2.01(b) of the Right To Use Agreement provides, in relevant part, that:

> LeaseCo covenants and agrees that, so long as no HPL Default has occurred and is continuing, and notwithstanding the terms, provisions and restrictions in any Counterparty Agreement, LeaseCo will have sufficient rights in and to the [Storage Gas] to enable it to make, and that it will cause and allow, such [Storage Gas] to be available to HPL at the Storage Facility for HPL's right to Quiet Enjoyment at all times during the Term[ of the sublease]. . . .  The existence of a Permitted Lien shall not be a breach by LeaseCo of this Section 2.01(b); provided, however, that LeaseCo covenants and agrees with HPL that LeaseCo shall timely perform and comply with those of its obligations under the Counterparty Agreements to which LeaseCo is a party applicable to the [Storage Gas], and shall timely perform and comply with its obligations hereunder with respect to amounts secured by Permitted Liens, to ensure that HPL has the Quiet Enjoyment of the [Storage Gas] throughout the Term.

Right To Use Agreement dated May 31, 2001 ("Right To Use Agreement") § 2.01(b), Exh. W to Rubinstein Decl.  Quiet enjoyment is defined in the Right To Use Agreement as "the Enjoyment of the [Storage] Gas free of adverse claims of Third Parties, of any kind or nature, in, to or with respect to the

12

[Storage] Gas, or any part thereof, that interfere with, restrict or impede the Enjoyment of the [Storage] Gas." Id. § 1.01 (definition of "Quiet Enjoyment"). The BofA secured loan is among the "Permitted Liens" that are contemplated by this provision, id. (definition of "Permitted Liens"), whose existence does not infringe on the right to quiet enjoyment under the agreement.

The Right To Use Agreement further provides that "LeaseCo shall use only Exchange Gas to satisfy its obligations under Article III of the Pressurization Agreement [setting forth the requirement to withdraw the gas in 2004 pursuant to the Withdrawal Schedule to be sold by Enron in repayment of the loan] to make withdrawals of Natural Gas from the Storage Facility." Id. § 8.01. This clause effectively provided the mechanism by which LeaseCo and Enron would repay the principal on the BofA loan when it came due in 2004 without interrupting HPL's right under the restructured agreements to quiet enjoyment and continued use of the Storage Gas for the thirty-year term of the sublease.

As part of the 2001 Transaction, each of the Operative Agreements executed in 1997 -- including the Participation Agreement, Pressurization Agreement, Security Agreement, and Guaranty -- was amended and restated to replace HPL and HPLR with LeaseCo. See Amended and Restated Participation Agreement dated May 31, 2001 ("2001 Participation Agreement"), Exh. L to Rubinstein Decl.; Amended and Restated Pressurization and Storage

13

Gas Borrowing Agreement dated May 31, 2001 ("2001 Pressurization Agreement"), Exh. N to Rubinstein Decl.; Amended and Restated Security Agreement dated May 31, 2001 ("2001 Security Agreement"), Exh. M to Rubinstein Decl.; Amended and Restated Performance Guaranty dated May 31, 2001 ("2001 Guaranty"), Exh. O to Rubinstein Decl. LeaseCo was used as a vehicle for granting HPL (and thereby AEP, which was purchasing HPL) all of the rights that HPL had had under the 1997 Transaction, while Enron continued to retain all of the obligations of HPL under that transaction (via LeaseCo), such that HPL could continue to use and operate the Storage Facility and the Storage Gas, but LeaseCo was now responsible for the payments of fees and other obligations to BGT.

All told, AEP paid more than $741 million for HPL and for the right to use the Storage Gas and Storage Facility.

As a condition precedent to the 2001 Transaction, BofA signed a Consent and Acknowledgment ("Consent"), consenting to the assignment of HPL's rights and obligations under the Operative Agreements to LeaseCo, and to HPL's use of the Storage Gas and Storage Facility as provided in the sublease and the Right To Use Agreement. The Consent acknowledges that HPL was entering into these transactions "in reliance upon" the execution of this Consent and that "but for" this Consent, AEP would not purchase HPL and HPL would not enter into the agreements with LeaseCo. Consent and Acknowledgment dated May 30, 2001 ("Consent") § 2(a)(ii), Exh. X to Rubinstein Decl.

14

The Consent contains several provisions of particular relevance to the plaintiffs' claims. Section 2(e) of the Consent, which provides the basis for AEP's non-declaratory tort and contract claims, reads:

> **Estoppel and Release**. Each of BofA and the Trustee hereby agrees and acknowledges that each Operative Agreement is in full force and effect and that, to its actual knowledge, no defaults by LeaseCo, Holdings, [Enron], [Enron North America] or [HPL] exist and no events or conditions exist which after the passage of time or the giving of notice or both would constitute a default or Event of Default by LeaseCo, Holdings, [Enron] or [Enron North America] or [HPL] thereunder.

Id. § 2(e). Under section 5.01 of the Guaranty, one of the Operative Agreements, any materially incorrect representation made by Enron under the Guaranty constitutes a default. Included among the representations made by Enron under the Guaranty is that:

> The audited consolidated balance sheet of Enron and its Subsidiaries as of December 31, 2000, and the related audited consolidated statements of income, cash flows, and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of Enron and its Subsidiaries as of March 31, 2001, and the related unaudited consolidated statements of income, cash flows, and changes in stockholders' equity accounts for the fiscal quarter then ended, . . . fairly present, in conformity with GAAP, . . . the consolidated financial position of Enron and its Subsidiaries. . . .

2001 Guaranty § 3.01(d)(i). This representation, as it subsequently would be learned, was dramatically false.

15

As related to the plaintiffs' declaratory claims, section 2(g) of the Consent provides that:

> In connection with the assignments referred to in clause (a)(i) of this Section 2 [providing for the assignment by HPL and HPLR of all rights and obligations under the Operative Agreements to LeaseCo (hereinafter the "Assigned Obligations")], each of BofA and the Trustee has agreed, and hereby agrees, to enforce payment and performance of the Assigned Obligations solely against LeaseCo and Holdings and has agreed to release, and hereby releases, each of [HPL] and HPLR from all liabilities and obligations under the Operative Agreements. . . .

Consent § 2(g). Section 11 further provides, "For avoidance of doubt, nothing herein shall impair the lien and security interest of BofA under the Security Agreement or, except as expressly set forth in Section 2 hereof, reduce the rights and remedies of BofA under the Security Agreement." Id. § 11. Section 2 of the Consent gives HPL, among other things, the right (but not the obligation) to cure any defaults that may arise that affect HPL's right to use the gas, and precludes the Trustee and BofA from exercising any of their rights and remedies granted by the Operative Agreements upon a default absent notice to and failure to cure by HPL. In addition to HPL's right to notice of and the opportunity to cure a default, under a Purchase Option Agreement (another of the Operative Agreements), HPL received from LeaseCo the right to purchase the Storage Gas outright if certain events of default occurred, including but not limited to Enron's entry into bankruptcy proceedings.

As relevant to this dispute, the rights and remedies of BofA under the Security Agreement include, in the event of a Guaranty Default, the right to obtain the remedies set forth in section 5.02 of the Guaranty. This section permits the Trustee, upon a Guaranty Default, to issue a Settlement Notice to Enron for the payment and settlement of all outstanding fees by a fixed date. If Enron fails thereafter to deliver, or to cause LeaseCo to deliver, Exchange Gas in lieu of the Storage Gas by that date, the Trustee may then, at BofA's direction and provided that neither Enron nor the plaintiffs have since cured the default, take possession of and withdraw the Storage Gas.

These restructured transactions all closed concurrently on May 31, 2001.

In December 2001, Enron petitioned for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Enron's petition for bankruptcy constituted a Guaranty Default under the Operative Agreements. See 2001 Guaranty § 5.01(c) ("A 'Guaranty Default' shall exist if . . . Enron or any of its Principal Subsidiaries shall become the subject of a Bankruptcy Event.").

Texas State Court Proceedings

In May 2002, following Enron's filing of its bankruptcy petition, BofA demanded access to the Storage Facility to enforce its security interest under the Operative Agreements by taking possession of the Storage Gas. When the plaintiffs -- AEP, HPL,

17

and HPLR -- refused, BofA filed an action against HPL in Texas state court seeking declarations that BofA held a valid and enforceable security interest in the Storage Gas, that it was entitled to pursue contractual remedies against HPL to foreclose on this interest and take possession of the gas, and that HPL's rights to use the Storage Gas were subordinate to BGT's ownership rights and BofA's security interest.  HPL then filed a breach of contract counterclaim against BofA, asserting that by bringing this lawsuit against HPL, BofA breached its representation that it would not interfere with HPL's rights to exclusive use and quiet enjoyment of the gas, and sought to enjoin BofA's interference with HPL's continued use of the gas.

In December 2003, the Texas state court granted summary judgment in defendant BofA's favor on both its declaratory claims and HPL's counterclaims, concluding that BofA had a valid security interest in the gas that was superior to any rights of HPL to use the gas, and that HPL was "estopped to deny" that BGT was the owner of the gas.  See Bank of Am., N.A. v. Houston Pipe Line Co., No. 2002-36488, slip op. at 2 (Tex. Dist. Ct. Dec. 9, 2003).  HPL appealed.  On August 24, 2006, the Texas State Court of Appeals vacated the judgment and ordered BofA's claims dismissed.  It concluded that the judgment was void because it violated the automatic stay implemented upon Enron's bankruptcy. Houston Pipeline Co. v. Bank of Am., N.A., 213 S.W.3d 418, 428-31 (Tex. App. 2006).

18

The Federal Proceedings

Meanwhile, in October 2003, AEP filed a complaint in the Texas District Court asserting claims for fraud, breach of contract, and negligent misrepresentation against BofA (collectively, the "Tort and Contract Claims") based on the allegedly false representation contained in section 2(e) of the Consent that BofA had no knowledge of any Enron default existing at the time of the execution of the agreement. On January 8, 2004, AEP filed an amended complaint adding five claims for declaratory relief seeking to confirm HPL's superior right to use the gas (the "Declaratory Claims"), and adding HPL and HPLR as plaintiffs and BONY as a second defendant.

Meanwhile, over AEP's objections, on January 15, 2004, the Enron bankruptcy court in New York issued an order approving a Settlement Agreement among Enron, BofA, and BONY (the "Enron Settlement Agreement"). The order allowed the claims relating to the Bammel Gas transaction filed by BofA and BONY as creditors in the bankruptcy proceeding, provided that BofA and BONY would "look solely to the proceeds, if any, from any Sale [of the Storage Gas], as paid to [BofA and BONY] pursuant to Section 8.5 of the Settlement Agreement, for recovery on any allowed BGT Claim. . . . " Order Approving Settlement Agreement at 9, In re Enron Corp., No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jan. 15, 2004). The order also permitted the automatic bankruptcy stay to be "lifted for the sole purpose of allowing the Secured Party [BofA] and the Trustee [BONY] to attempt to realize upon the value of

19

the [Storage] Gas, including allowing the Secured Party and/or the Trustee to cause the issuance of a Settlement Notice and a written notice of an Event of Default (as each such term is defined in the Operative [Agreements])." Id.

Pursuant to this order, BofA sent Notices of Default and Settlement Notices, in accordance with the terms of the Guaranty, to Enron and LeaseCo, with copies to AEP and HPL. Enron did not perform its purported obligations under the Guaranty in response to these letters. Nor did AEP exercise its options under the Operative Agreements to cure the default or to purchase the gas. As a result, on May 14, 2004, BofA demanded that AEP withdraw and transfer custody of 55 Bcf of natural gas in the Storage Facility to BofA. AEP refused.

Back in Texas, on April 6, 2005, the Texas District Court, adopting a September 14, 2004 memorandum and recommendation of a magistrate judge, severed the plaintiffs' Declaratory Claims from their Tort and Contract Claims and transferred the Declaratory Claims only to the New York District Court pursuant to 28 U.S.C. § 1404(a). The Texas District Court concluded that transfer was proper because the resolution of the Declaratory Claims, insofar as they sought a declaration of the rights and obligations under the Operative Agreements to which Enron was a party, and to the extent that they implicated the terms of the Enron Settlement Agreement, could affect legal interests at issue in the Enron bankruptcy proceeding then pending in the Southern District of New York. The Texas District

20

Court retained AEP's Tort and Contract Claims, however, which claims did not implicate the terms of any agreements at issue in the bankruptcy proceedings.

That month, BofA filed an answer in the Texas District Court action. It also asserted counterclaims, in its capacity as BONY's representative, against HPL for breach of contract, breach of bailment agreement, conversion/trover, and detinue/replevin (the "Declaratory Counterclaims") and, in its own capacity, against AEP and HPL for fraud and fraudulent inducement (the "Tort Counterclaims") based on those parties' purported misrepresentations that induced BofA to execute the Consent.

Shortly thereafter, BofA moved in the Texas District Court to transfer the entire action to the New York District Court. On June 29, 2005, a magistrate judge in the Texas District Court recommended that this motion be granted in part and denied in part. In recommending against the transfer of AEP's Tort and Contract Claims to New York, the magistrate judge explained that "the court's decision [in its previous order] to transfer the declaratory claims and retain all other claims was deliberate" and that "[t]he [declaratory] claims that were transferred are clearly distinct in nature from the [tort and contract] claims retained in this suit." Memorandum, Recommendation and Order at 2, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., Civil No. H-03-4973 (S.D. Tex. June 29, 2005). The magistrate judge further concluded that BofA's "reiteration of this transfer argument is improper," noting that

21

BofA had made the same argument to the Texas District Court in objecting to the September 14, 2004 recommendation to transfer only the declaratory claims, which argument the district court had "necessarily rejected [at that time] . . . by adopting" the magistrate judge's recommendation to transfer those claims alone. Id. at 3.

The magistrate judge recommended, however, that the Declaratory Counterclaims filed by BofA, which paralleled the Declaratory Claims filed by the plaintiffs, be severed from the Tort Counterclaims and transferred to the New York District Court, and that AEP's motion pending in the Texas District Court to amend the complaint to eliminate the Declaratory Claims in conformance with the previous transfer order be granted. On August 31, 2005, the Texas District Court adopted this recommendation in full and ordered the Declaratory Counterclaims severed and transferred to New York.

Pursuant to the Texas District Court's initial transfer order, the record in this action, including the original complaint, was administratively transferred from the Texas District Court to the New York District Court to initiate proceedings here. The plaintiffs then moved in the New York District Court, as they had in the Texas District Court, to amend the complaint in order to conform the pleadings to the transfer order. Specifically, the plaintiffs moved, inter alia, to restate the Declaratory Claims that had been transferred to New

22

York, to eliminate the Tort and Contract Claims that remained in Texas, and to eliminate AEP as a plaintiff.

The New York District Court held two status conferences with the parties to address this issue, during which the court informed the parties that "for reasons of judicial economy, the entire case should be tried in one place." AEP I, 2007 WL 2428474, at *6, 2007 U.S. Dist. LEXIS 63421, at *19. To this end, the court suggested that if it were to grant the plaintiffs' motion to amend the complaint to eliminate the Tort and Contract Claims, BofA could simply file a mirror-image third-party complaint on these same issues against AEP in New York in order "to effectively bring those claims before this court." Id. On November 30, 2005, the New York District Court issued a memorandum to the parties inviting defendant BofA to "file a third-party complaint against AEP" in order "to bring all the issues before the court in the New York case," and stating that it deemed AEP "subject to the jurisdiction of the court by virtue of having appeared here as a plaintiff, even though it now seeks to withdraw as such." Memorandum to Counsel at 2, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Nov. 30, 2005). BofA then filed that complaint as the court suggested.

In light of these developments, as the New York District Court later explained: "Recognizing that it could not avoid litigating the claims in this court, AEP consented to the denial of the part of its May 13 motion [to amend the complaint]

23

that related to the elimination of AEP[ as a plaintiff] and the [tort and contract] claims, thereby agreeing to have them remain in the complaint." AEP I, 2007 WL 2428474, at *6, 2007 U.S. Dist. LEXIS 63421, at *19. Accordingly, on January 5, 2006, the New York District Court denied AEP's motion to amend the complaint in these respects, stating only that it had "essentially been agreed" that these motions would be denied. AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248, slip op. at 2 (S.D.N.Y. Jan. 5, 2006). The court did grant plaintiff AEP's motion to amend the complaint in other respects, however, including a restatement of the Declaratory Claims that were properly before the New York District Court. It also dismissed defendant BofA's third-party complaint as moot. Consistent with this order, on January 6, 2006, the plaintiffs filed a second amended complaint in the New York District Court that included the Tort and Contract Claims.

Based on what had transpired in New York, and in light of the New York District Court's expressed intention to adjudicate the entire dispute, defendant BofA filed a renewed motion in the Texas District Court to transfer venue of the Tort and Contract Claims and the related Tort Counterclaims to New York. In a September 22, 2006 order, the Texas magistrate judge denied the motion. She emphatically rejected the validity of any purported "new" grounds for transfer:

> The "recent development" from which all of
> [BofA]'s arguments flow is the sua sponte
> decision of the New York court to exercise

24

> jurisdiction over the contract and tort claims and counterclaims. However, as far as this court is concerned, this court has retained jurisdiction over those claims. This court severed the declaratory actions from the contract and tort claims and counterclaims and transferred only the former [to New York]. . . .
>
> BofA makes no attempt to explain how the United States District Court for the Southern District of New York can assert jurisdiction over claims presently before this court. . . . Absent some legal explanation of that court's jurisdiction over the contract and tort claims and counterclaims, this court finds no reason to revisit the transfer issue. In fact, the parties should be concerned whether those claims are properly before the New York court and whether a judgment issued by the United States District Court for the Southern District of New York on the contract and tort claims and counterclaims would be a nullity.

Order at 4-5, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., Civil No. H-03-4973 (S.D. Tex. Sept. 22, 2006). On October 27, 2006, the Texas District Court adopted this order and denied the motion for transfer.

BofA then filed a petition for a writ of mandamus to the Fifth Circuit, seeking to vacate the Texas District Court's order denying the motion to transfer and to compel the Texas District Court "to transfer the remaining claims to the New York Court." Petition for Writ of Mandamus at 2, In re Bank of Am., N.A., No. 06-20875 (5th Cir. Nov. 13, 2006). On December 5, 2006, the Fifth Circuit denied this petition.

Back in the Texas District Court after the Fifth Circuit's denial of mandamus, and following three essentially

25

failed motions by BofA for a continuance and to stay the trial, the Tort and Contract Claims and related Tort Counterclaims were assigned to District Judge Hittner for trial beginning in April 2007. At the same time, in New York, the Tort and Contract Claims along with the Declaratory Claims and Counterclaims proceeded toward summary judgment.

On June 16, 2006, the plaintiffs -- AEP, HPL, and HPLR -- moved in the New York District Court for partial summary judgment as to two of the Declaratory Claims and as to the Declaratory Counterclaims. BofA opposed this motion, and also separately moved for summary judgment on all of the claims and counterclaims asserted by the parties.

On October 25, 2006 -- shortly after the Texas State Court of Appeals vacated the Texas state trial court's 2003 judgment in favor of BofA on the grounds that it violated the automatic bankruptcy stay -- the plaintiffs moved in the New York District Court to file a third amended complaint to add a declaratory claim that the Bammel Gas transaction was not a "true sale" of the gas. They had theretofore been precluded from pleading the claim because the Texas state court judgment then in effect had "estopped" them from denying that BGT was the true owner of the gas. At the same time, the plaintiffs again moved in the New York District Court to strike the Tort and Contract Claims from the complaint.

On January 31 and February 1, 2007, the New York District Court held oral argument on the parties' summary

26

judgment motions. At its conclusion, the court announced various findings on the record regarding the Declaratory Claims and Counterclaims, but reserved judgment as to the Tort and Contract Claims. On February 20, 2007, prior to the New York District Court's resolution of the Tort and Contract Claims, AEP moved in the Texas District Court to enjoin BofA from seeking rulings on these claims in New York, which motion was denied.

On March 12, 2007, the New York District Court held a hearing on the subject of the Tort and Contract Claims. After indicating that it would require significant additional time to resolve these issues, and in response to the parties' inquiry as to how to handle the upcoming Texas trial on these issues scheduled for less than a month later, the New York District Court stated that it would "suggest to [Judge Hittner in Texas] that any [such] trial should be put off" pending resolution of the summary judgment motions in New York. Transcript of Record at 142, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Mar. 12, 2007).

The following day, in apparent response to the New York District Court's statement, defendant BofA filed a third motion for continuance in the Texas District Court seeking to postpone the scheduled trial to allow the New York District Court to resolve the pending summary judgment motions. In support, BofA attached and quoted from the relevant portions of the hearing transcript in which Judge Griesa indicated that he would communicate to Judge Hittner "[his] belie[f that] the trial date

27

should be continued to allow him to complete his work on the summary judgment motion." Bank of America's Third Motion for Continuance at 2, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., Civil No. H-03-4973 (S.D. Tex. Mar. 13, 2007). On March 14, notwithstanding several prior refusals to continue or stay the trial, Judge Hittner granted BofA's third motion for a continuance "pending the issuance of a summary judgment order" by the New York District Court. Order at 1, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., Civil No. H-03-4973 (S.D. Tex. Mar. 14, 2007).

Finally, on March 26, 2007, the plaintiffs filed another motion in the New York action under Federal Rule of Civil Procedure 56(f), seeking to continue the summary judgment motions and to reopen discovery in order to permit the plaintiffs to depose two additional witnesses: former Enron CFO Andrew Fastow and former Arthur Andersen auditor Mary Cilia.

The New York District Court's Decisions

In a February 22, 2007 memorandum and an August 28, 2007 opinion, the New York District Court granted summary judgment in BofA's favor, dismissing all of the plaintiffs' Declaratory Claims and Tort and Contract Claims, and granting BofA relief on its counterclaims for conversion, breach of bailment agreement, and replevin. The remaining counterclaims were contingent on AEP prevailing on its tort claims and were therefore rendered moot by this judgment. See AEP I, 2007 WL 2428474, at *1-2, *17, 2007 U.S. Dist. LEXIS 63421 at *3-*7,

28

*47-*48; see also Memorandum to Counsel ("Memorandum Op."), AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Feb. 22, 2007).

The district court first rejected the plaintiffs' contention that it lacked jurisdiction to resolve the Tort and Contract Claims, reasoning that "since AEP consented to the arrangement whereby the [tort and contract] claims remained in this court, . . . AEP waived its objection to this court's jurisdiction." AEP I, 2007 WL 2428474, at *8, 2007 U.S. Dist. LEXIS 63421, at *24. The court therefore denied the plaintiffs' renewed motion to amend the complaint to eliminate these claims, reiterating its view that "it is most efficient to have this case tried in one forum." Memorandum Op. at 7-8; see also AEP I, 2007 WL 2428474, at *8, 2007 U.S. Dist. LEXIS 63421, at *24. It also denied the plaintiffs' motion to amend the complaint to add a new declaratory claim based on the assertion that there had been no "true sale" of the gas, concluding that such an amendment would be "futile" because the 1997 Transaction "was not a sham" as the plaintiffs had alleged. Memorandum Op. at 7; see also AEP I, 2007 WL 2428474, at *8, 2007 U.S. Dist. LEXIS 63421, at *24.

The court then turned to the parties' summary judgment motions. With respect to the Declaratory Claims and Counterclaims, the court determined that defendant BofA had a valid, presently enforceable security interest in the Storage Gas that was not subordinated in the 2001 Transaction and that was superior to the plaintiffs' right to use the gas. AEP I, 2007 WL

29

2428474, at *1, 2007 U.S. Dist. LEXIS 63421, at *5; see also Transcript of Record at 150, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Feb. 1, 2007). It also concluded that the Enron bankruptcy constituted an event of default under the relevant agreements, and that BofA's right to enforce its security interest upon an event of default was not affected by the Enron Settlement Agreement. AEP I, 2007 WL 2428474, at *1, 2007 U.S. Dist. LEXIS 63421, at *5; see also Transcript of Record at 155, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Feb. 1, 2007). In light of these findings, the court concluded that HPL's refusal to relinquish the gas upon BofA's demand constituted conversion, breach of bailment, and replevin, and granted summary judgment to BofA on these claims. See Memorandum Op. at 5.

Turning to the Tort and Contract Claims, the court concluded that section 2(e) of the Consent, on which these claims were based, "was an estoppel provision and not a representation" and therefore could not constitute the basis for any misrepresentation-based claims as a matter of law. AEP I, 2007 WL 2428474, at *9, 2007 U.S. Dist. LEXIS 63421, at *27. Assuming arguendo that section 2(e) was a representation, however, the court nonetheless rejected these claims on the merits based on a lack of evidence that plaintiff AEP had relied on BofA for such

30

accounting judgments related to Enron's financials.[7]  Id., 2007 WL 2428474, at *14, 2007 U.S. Dist. LEXIS 63421, at *39-*40.

The district court summed up its views as follows:

> When all the complexities of these
> transactions are sorted out in light of the
> various detailed arguments of the parties,
> two basic conclusions emerge.  BofA dealt
> with Enron and its related entities on a
> secured basis.  AEP dealt with Enron and its
> related entities on a non-secured basis and
> thus took the risks that were unfortunately
> involved with that dealing.  This litigation
> has been concerned with the effort of AEP to
> remove BofA from its secured position.
> However, BofA has done nothing, by contract
> or otherwise, to relinquish that position.

Id., 2007 WL 2428474, at *17, 2007 U.S. Dist. LEXIS 63421, at *48-*49.

Finally, in light of its finding that the plaintiffs could not prove reliance with respect to the Tort and Contract Claims, the court denied the plaintiffs' request to continue summary judgment proceedings in order to take two additional depositions to determine the status of defendant BofA's knowledge.  See id., 2007 WL 2428474, at *15, 2007 U.S. Dist. LEXIS 63421, at *43.

On December 18, 2007, the New York District Court issued a second opinion as to the form and amount of judgment due

---

[7] Because we do not reach the merits of this portion of the district court's decision in resolving this appeal, we do not address the district court's conclusion that, in the context of this case, AEP's breach of contract claim (Count VII) would require proof of reliance in the same manner in which fraud and misrepresentation claims normally require this element to be met. AEP I, 2007 WL 2428474, at *14, 2007 U.S. Dist. LEXIS 63421, at *39-*40.

31

defendant BofA on its conversion counterclaim. See AEP II, 2007 WL 4458117, 2007 U.S. Dist. LEXIS 93022. The court concluded that because "AEP converted the gas by refusing to turn it over to BofA when BofA requested it," BofA was entitled either to money damages or to the return of the gas under Texas law. Id., 2007 WL 4458117, at *1, 2007 U.S. Dist. LEXIS 93022, at *2-*3. BofA elected money damages for the value of the gas, which the court determined to be $347,325,000. Id., 2007 WL 4458117, at *1, *4, 2007 U.S. Dist. LEXIS 93022, at *3, *12. This figure represented the Houston Ship Channel market value of the gas on the date of conversion, which the court fixed at May 14, 2004. Id., 2007 WL 4458117, at *1, *4, 2007 U.S. Dist. LEXIS 93022, at *3, *12. The court concluded, however, that this amount was required to be reduced by the cost to BofA of removing the natural gas from the Storage Facility had it elected to take possession rather than money damages. Id., 2007 WL 4458117, at *5, 2007 U.S. Dist. LEXIS 93022, at *13-*14. Those costs were to be determined at a later date. Id., 2007 WL 4458117, at *5, 2007 U.S. Dist. LEXIS 93022, at *14.

The plaintiffs -- AEP, HPL, and HPLR -- moved for reconsideration of the court's finding that conversion occurred on May 14, 2004, contending that instead the correct date of conversion was July 22, 2002, when the gas's market price was lower. On April 2, 2008, the court denied that motion as untimely because, it found, the plaintiffs had failed to raise this argument prior to the court's December 18 decision. AEP

32

III, 2008 WL 925433, at *1-*2, 2008 U.S. Dist. LEXIS 30587, at *3-*5.  The court nonetheless then proceeded to address this question on the merits, confirming its view that May 14, 2004, was the correct date of conversion because "BofA had no legal right to demand or obtain custody of the gas until after the automatic stay in the Enron bankruptcy was lifted in 2004."  Id., 2008 WL 925433, at *2, 2008 U.S. Dist. LEXIS 30587, at *6.

In a fourth opinion, on August 11, 2008, the district court calculated the withdrawal cost of the gas, at three cents per MMBtu, as $1.65 million and set BofA's total damages at $345,675,000 plus prejudgment interest.  AEP IV, 2008 WL 3338203, at *1-*2, 2008 U.S. Dist. LEXIS 61264, at *4-*6.

### The Instant Appeal

The plaintiffs -- AEP, HPL, and HPLR -- appeal from these judgments on several grounds.  As an initial matter, they contend that the New York District Court lacked jurisdiction over the Tort and Contract Claims in light of the Texas District Court's unambiguously limited transfer orders and therefore erred in adjudicating these claims.  The plaintiffs urge us to vacate the grant of summary judgment as to these claims on this ground.

In the alternative, the plaintiffs assert that even if the New York District Court did have the power to adjudicate the Tort and Contract Claims, it nonetheless erred in concluding that section 2(e) of the Consent was an estoppel provision rather than a representation and granting summary judgment in favor of BofA on the merits of these claims.

33

The court also erred, the plaintiffs assert, in granting summary judgment in favor of BofA on the Declaratory Claims and BofA's Counterclaims and in its determination of the award of damages due to BofA on its counterclaim for conversion.

Finally, the plaintiffs contend that the district court erred in denying their motions to amend the complaint to add the "no true sale" claim and to continue summary judgment proceedings in favor of additional depositions.

We conclude that in light of the content of the Texas District Court's transfer orders, the New York District Court abused its discretion in compelling the plaintiffs to litigate the Tort and Contract Claims in New York. We therefore vacate the grant of summary judgment as to these claims, which we conclude should properly be adjudicated in Texas. We disagree with the plaintiffs with respect to their remaining contentions on appeal. We conclude that the district court correctly granted summary judgment in favor of BofA on the Declaratory Claims and Counterclaims, which had been properly transferred by the Texas District Court to New York, and properly awarded damages to BofA in the amount of $345,675,000 plus prejudgment interest. We further conclude that the district court's denial of the plaintiffs' motions to amend the complaint to add the "no true sale" claim and to continue summary judgment proceedings was proper. We therefore affirm the district court's judgment in each of these respects.

34

**DISCUSSION**

I.  Summary Judgment as to the Tort and Contract Claims

The plaintiffs -- AEP, HPL, and HPLR -- contend on appeal that because the Tort and Contract Claims and related Tort Counterclaims were never transferred by the Texas District Court to the New York District Court under 28 U.S.C. § 1404, nor were they properly filed in the New York District Court, the New York District Court had no valid basis for exercising jurisdiction over these claims.  The defendants take issue with the plaintiffs' interpretation of 28 U.S.C. § 1404 as it relates to jurisdiction, arguing that section 1404 speaks solely to the power of a district court to transfer <u>venue</u> of an action, which, they contend, is different from the question of a district court's power to exercise general <u>subject matter jurisdiction</u> over a dispute.  Therefore, they assert, the Texas District Court's decision to transfer venue of only the Declaratory Claims and Counterclaims in no way affected the New York District Court's general "constitutional power" to adjudicate the entire dispute.  Appellees' Br. 93-94 (emphasis, citation, and internal quotation marks omitted).

We are reluctant to couch our decision in terms of the New York District Court's "jurisdiction" to hear these claims. <u>Cf.</u> <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 511 (2006) (condemning the use of "'drive-by jurisdictional rulings'" that conflate a federal court's subject matter jurisdiction with "the question

35

whether the federal court had authority to adjudicate the claim in suit" (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 91 (1998))); Steel Co., 523 U.S. at 90 ("'Jurisdiction . . . is a word of many, too many, meanings'" that is often misused to describe "the remedial powers of the court" to adjudicate a claim and to impose penalties (emphasis in original) (quoting United States v. Vanness, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996))).

Under the circumstances presented, the New York District Court abused its discretion in adjudicating the Tort and Contract Claims and related Tort Counterclaims that remained pending in the Texas District Court. We therefore vacate the New York District Court's grant of summary judgment as to these claims, which we conclude should be adjudicated in Texas.

A. Standard of Review

A district court's decision whether to stay or dismiss an action on grounds of comity is reviewed for abuse of discretion. See Adam v. Jacobs, 950 F.2d 89, 92 (2d Cir. 1991) (citing Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183-84 (1952)).

B. The Power to Adjudicate the Tort and Contract Claims

To resolve the question whether the New York District Court had the power to adjudicate the Tort and Contract Claims, we must first examine the implications of a transfer of venue under 28 U.S.C. § 1404. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice,

36

a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a); see also Van Dusen v. Barrack, 376 U.S. 612, 616 (1964). Pursuant to this provision, the Texas District Court severed the Declaratory Claims and related Counterclaims from the remaining Tort and Contract Claims and Counterclaims, and transferred only the Declaratory Claims and related Counterclaims to the New York District Court. Despite the clear terms of the transfer order, the New York District Court proceeded, over the plaintiffs' objections, to exercise jurisdiction over the entire dispute. It then resolved all claims on summary judgment, even while the Tort and Contract Claims and Counterclaims were still actually pending in the Texas District Court. The question, therefore, is whether the New York District Court had a valid basis for doing so. We conclude that it did not.

We begin with the premise that the question whether a district court has subject matter jurisdiction over a dispute, as a general matter, is substantively different from the question whether a district court has, or has acquired, the power to adjudicate a particular dispute. It is well-settled that subject matter jurisdiction "concerns a court's competence to adjudicate a particular category of cases." Wachovia Bank v. Schmidt, 546 U.S. 303, 316 (2006); see also Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 643 (2002) (explaining that subject matter jurisdiction refers, as a general matter, to "the courts' statutory or constitutional power to adjudicate the case"

37

(emphasis and internal quotation marks omitted)). Unlike venue, subject matter jurisdiction "does not entail an assessment of convenience. It poses a 'whether,' not a 'where' question: Has the Legislature empowered the court to hear cases of a certain genre?" Schmidt, 546 U.S. at 316.

This action was filed in the Texas District Court pursuant to 28 U.S.C. § 1332(a), which grants federal district courts "original jurisdiction of all civil actions" that meet the requirements for federal diversity jurisdiction enumerated therein. The New York District Court, no less than the Texas District Court, then, has general federal subject matter jurisdiction over the category of cases into which this dispute falls. We have been given no reason to doubt that had this action been properly filed in the New York District Court in the first instance rather than in Texas, the New York District Court would therefore have had the power to adjudicate these claims. But, of course, it was not first filed in New York; it was filed in Texas. As to the New York District Court's power to decide these claims, using the language of Schmidt, id., the question of "whether" has been answered in the affirmative; it is the "where" that remains in issue.

Once the Texas District Court severed the Tort and Contract Claims and Counterclaims from the Declaratory Claims and Counterclaims, they became two separate actions. See Wyndham Assocs. v. Bintliff, 398 F.2d 614, 618 (2d Cir. 1968) ("Where certain claims are properly severed, the result is that there are

38

then two or more separate 'actions,' and the district court may, pursuant to § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others."). The Texas District Court ordered only the Declaratory Claims transferred to New York, a plainly "deliberate" act on its part. Memorandum, Recommendation and Order at 2, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., Civil No. H-03-4973 (S.D. Tex. June 29, 2005). It is also clear that the New York District Court, as the transferee court, could not transfer to itself the Tort and Contract action currently pending before the Texas District Court. As we have explained, the language of section 1404(a) clearly "presupposes that the action to be transferred is pending in the transferor court" and does not therefore allow for an action to be transferred by another district court before whom the action is not then pending. See Nat'l Equip. Rental, Ltd. v. Fowler, 287 F.2d 43, 46-47 (2d Cir. 1961) (noting that "[t]he administration of justice would be chaotic indeed if one district court could order another to divest itself of jurisdiction and to transfer a case properly before it").

There is no dispute that the Texas District Court did not validly transfer the Tort and Contract Claims and Counterclaims to New York. And it is undisputed that it intended to, and did, retain jurisdiction over these claims. Indeed, this remained true even after the Texas District Court became aware of "the sua sponte decision of the New York court to exercise jurisdiction over the contract and tort claims and

39

counterclaims."  Order at 4-5, <u>AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.</u>, Civil No. H-03-4973 (S.D. Tex. Sept. 22, 2006) (perceiving no explanation of "how the United States District Court for the Southern District of New York can assert jurisdiction over claims presently before this court" and cautioning the parties to "be concerned whether those claims are properly before the New York court and whether a judgment issued by the United States District Court for the Southern District of New York on the contract and tort claims and counterclaims would be a nullity").

Nor do we conclude that the Tort and Contract Claims and Counterclaims were properly brought in the New York District Court.  Following the transfer order, the Texas District Court promptly permitted the plaintiffs to amend their complaint, which included the Tort and Contract Claims, to eliminate the Declaratory Claims that had been transferred to New York; the plaintiffs promptly moved in the New York District Court to amend similarly the transferred complaint to eliminate the Tort and Contract Claims to comport with the transfer order.[8]

---

[8]  We place little weight on the fact that the entire original complaint, which included the Tort and Contract Claims, was transferred as part of the record from the Texas District Court to the New York District Court following the initial transfer order.  This purely ministerial act could not have endowed the New York District Court with the ability to decide the Tort and Contract Claims where the Texas District Court's transfer order explicitly transferred only the Declaratory Claims to New York.  This is especially true in light of the fact that only one operative complaint existed in the record at the time of the transfer order.

To be sure, following the denial of their motion to amend, the plaintiffs filed an amended complaint in the New York District Court that included the Tort and Contract Claims. It is clear from the record, however, that the plaintiffs did not consent to the New York District Court's adjudication of these claims, and in fact repeatedly and vigorously protested it. The plaintiffs' November 10, 2006 letter to the New York District Court, regarding their motion for leave to amend the complaint prior to summary judgment in order to, inter alia, eliminate the Tort and Contract Claims, made their position clear:

> Plaintiffs never consented to this Court's exercise of subject matter jurisdiction over the AEP[] tort and contract claims, nor could they. . . . Following transfer of the declaratory claims to this Court, Plaintiffs moved for leave to amend the Complaint. Although Plaintiffs informed the Court that AEP[]'s tort and contract claims had not been transferred to New York, the Court nevertheless denied permission to amend the complaint to eliminate reference to the tort and contract claims. The Court indicated that it would allow Defendants to duplicate those claims in this Court through a mirror-image third-party complaint. In order to avoid duplication, Plaintiffs agreed that the most efficient way to implement the Court's decision was to deny the motion to amend as to the tort and contract claims. However, as the Texas court recently pointed out [in its denial of BofA's third motion to transfer these claims], these events were insufficient to convey jurisdiction on this Court that it otherwise does not have.

Plaintiffs' Letter to Court at 3, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Nov. 10,

2006).[9]  It was only when faced with the Hobson's choice presented to them by the New York District Court that the plaintiffs retained the Tort and Contract Claims in the amended complaint filed in New York.[10]

---

[9] BofA also memorialized this course of events in a November 23, 2005 letter to the court:

> Your Honor may recall that the fact that there are two separate actions pending regarding this dispute, one before Your Honor and the other in the Federal Court in Texas, wherein the action before Your Honor purports to address "contract" claims and the action in the Texas Federal Court purports to separate out and separately address other contract claims under the same contract as well as purported "fraud" claims arising out of the contract, was described by Your Honor as "litigation chaos."  As a result, Your Honor indicated that Your Honor "could not imagine splitting the case in two," noted that it was Plaintiffs themselves who had originally filed one action addressing all such claims and that "Plaintiffs filed one action and there will be one action here, that's it", and that there should be one set of appropriate pleadings "which would allow the trial of the whole case in New York."
>
> As a result, Your Honor directed that, if Bank of America chose to do so, it could file appropriate pleadings, such as declaratory judgment claims regarding AEP[]'s fraud claims or other appropriate pleadings, to get all of the issues before Your Honor.  Your Honor further directed Bank of America to submit such pleadings by December 12, 2005 or to send Your Honor a letter by that date indicating that it was declining to do so.

Defendant Bank of America's Letter to Court at 1-2, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Nov. 23, 2005).

[10] Since BofA's proposed third-party complaint was never filed, any analysis of it would be speculation at best. Furthermore, as we explain later in this Section, the New York

42

In light of these events, we cannot say that the amended complaint that included the Tort and Contract Claims was properly or voluntarily brought by the plaintiffs in New York. We therefore see insufficient grounds for the New York District Court's adjudication of the Tort and Contract Claims and Counterclaims in this case.

We have recognized "the basic proposition that the first court to obtain jurisdiction of the parties and of the issues should have priority over a second court to do so." Fowler, 287 F.2d at 45 (citing Joseph Bancroft & Sons Co. v. Spunize Co. of Am., 268 F.2d 522, 524 (2d Cir. 1959)). Thus, we have held that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989) (alterations, citations, and internal quotation marks omitted). Deference to the first filing "embodies considerations of judicial administration and conservation of resources," id. at 80, and recognizes that "a party who first brings an issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter," Fowler, 287 F.2d at 45 (citation and internal quotation marks omitted).

District Court abused its discretion by considering any claim paralleling those already pending in Texas. Therefore, we decline to address whether BofA could have properly brought the Tort and Contract Claims before the New York District Court.

It is well-established, then, that "when a case is brought in one federal district court[ and the complaint] embraces essentially the same transactions as those in a case pending in another federal district court, the latter court may enjoin the suitor in the more recently commenced case from taking any further action in the prosecution of that case."  Fowler, 287 F.2d at 45 (affirming order by New York court enjoining later-filed action from proceeding in Alabama); see also Martin v. Graybar Elec. Co., 266 F.2d 202, 204 (7th Cir. 1959) (citing "the established general rule that the party filing later in time should be enjoined from further prosecution of his suit").

Even in the absence of such an injunction, however, the second court may be bound to stay its consideration of an action in deference to the first-filed proceedings.  While the decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion, normally "[s]ound judicial discretion dictates that the second court decline its consideration of the action before it until the prior action before the first court is terminated," Fowler, 287 F.2d at 45, and "a district court can go 'beyond the allowable bounds of discretion' when it refuses to stay or dismiss a duplicative suit," Adam, 950 F.2d at 92 (quoting Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1204 (2d Cir. 1970) (Friendly, J.)).

In this case, the Texas District Court, as the court of first filing, might well have enjoined the Tort and Contract Claims from proceeding in New York. We are not in a position to

44

offer a view as to the Texas District Court's action or inaction in this regard. But we need not do so to recognize the separate obligation that the New York District Court had to consider whether to hear the Tort and Contract Claims and Counterclaims that were already pending, and proceeding to trial, in the Texas District Court.

We addressed a similar situation in Semmes Motors. There, we considered a New York district court's refusal to stay its consideration of an action pending before it that had first been filed in federal court in New Jersey. Even though the New Jersey court in Semmes Motors, like the Texas District Court in this case, had not acted to enjoin the New York lawsuit from proceeding, we concluded that the New York court had an independent obligation to defer to the primacy of the first-filed suit and had abused its discretion in not doing so. Semmes Motors, 429 F.2d at 1202-03. Although we had "no doubt that the New Jersey court could properly have enjoined prosecution of the New York action . . . , and might even have been bound to do so," we saw "no reason why the end result should be different when the party seeking to preserve the primacy of the first court moves the second court to stay its hand rather than asking the first court to enjoin prosecution of the second case." Id. at 1202. "Whatever the procedure," we concluded, "the first suit should have priority." Id.

In Semmes Motors it was the plaintiff who had instituted both actions and preferred to press the second suit in

45

New York, stipulating to discontinue the first in New Jersey, rather than the defendant who attempted to thwart the plaintiff's chosen forum by filing second in the forum of its own choice. Id. at 1202-03. Neither this, nor the fact that "in a vacuum, New York is a more logical forum than New Jersey," were "[]sufficient grounds for departing from the general rule that in the absence of sound reasons the second action should give way to the first." Id. at 1203.

And in Adam, we concluded that a New York district court had abused its discretion by failing to abstain from consideration of an action that should have been asserted as a compulsory counterclaim in another, previously filed proceeding. Relying on Fowler and Semmes Motors, we concluded that the failure of the court in which the first filing had been made to enjoin the second action was irrelevant to the second court's obligation to stay its own consideration: "While the normal chronology would have been for the court of first impression -- here, the Michigan court -- to have enjoined the second court, this procedure is not mandatory. The same policies are furthered by the second court's exercising judicial self-restraint." Adam, 950 F.2d at 93. We also noted that "[f]or us to refuse to stay our own proceedings while exercising a willingness to enjoin parties from litigating in other courts would be inconsistent." Id. at 94.

In other words, regardless of the action or inaction of the first court, "[s]ound judicial discretion" ordinarily

requires that the second court decline consideration of the action in deference to the proceedings pending before the first court.  _Fowler_, 287 F.2d at 45. "The same policies are furthered by the second court's exercising judicial self-restraint" as by

the first court's issuing an injunction.  <u>Adam</u>, 950 F.2d at 93.[11]

---

[11]  As Justice Frankfurter noted in one of his dissents in <u>Hoffman v. Blaski</u>, 363 U.S. 335 (1960), "[s]urely, a prior decision of a federal court on the unfundamental issue of venue ought to receive [preclusive] respect from a coordinate federal court when the parties and the facts are the same."  <u>Id.</u> at 348 (Frankfurter, <u>J.</u>, dissenting).  Hoffman consisted of two different cases heard in tandem.  See id. at 336-39 (majority opinion).  Justice Frankfurter's language is taken from a dissent in one of the cases,  id. at 345-50 (Frankfurter, J., dissenting), expressing a view on the preclusive effect that an order of the Court of Appeals for the transferor jurisdiction, upholding a transfer, should have on a subsequent order of the Court of Appeals for the transferee jurisdiction denying the propriety of that transfer.  Justice Frankfurter dissented from the judgment of the Court in that case based on the ground that the decision in that case should have been based on the concerns underlying the doctrines of res judicata and comity between sister circuit courts.  He went on to note:

> The fact that the issue involved is the propriety of a transfer of the action only makes the case for deference to the previous decision of a coordinate court in the same litigation that much stronger. . . . It perverts those ends [of "convenience" and "justice" set forth in 28 U.S.C. § 1404(a)] to permit a question arising under § 1404(a), as here, to be litigated, in turn, before a District Court and Court of Appeals in one Circuit, and a District Court and Court of Appeals in another Circuit. . . .

<u>Id.</u> at 349 (Frankfurter, <u>J.</u>, dissenting).

And as the Supreme Court has recognized, in reasoning that we later employed, "'transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation.'"  SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 178 n.7 (2d Cir. 2000) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)); <u>see also</u> <u>Fowler</u>, 287 F.2d at 47 (Lumbard, <u>C.J.</u>, dissenting in part) (concurring with the general proposition that the first-filed court may enjoin proceedings in the second-filed court, but concluding that "[t]he principles of comity and judicial economy seem to me to require us to hold that [the plaintiff]'s decision first to litigate in the Alabama federal court the question of where the dispute should be tried precluded it from raising the question again in the Eastern District of New York after the Alabama federal court had ruled against it").

BofA can identify no special circumstances sufficient to overcome the presumption in favor of adjudication of the Tort and Contract Claims in the Texas District Court. First of all, there is absolutely no evidence that "a manifest wrong or injustice" would have befallen either party had the New York District Court stayed its hand. Joseph Bancroft & Sons, 268 F.2d at 524. In fact, after transferring the Declaratory Claims to New York, the Texas District Court continued to adjudicate the Tort and Contract Claims before finally staying proceedings in anticipation of the New York District Court's ruling. Second, there is no evidence that AEP's initial decision to bring suit in Texas was motivated by forum-shopping. See William Gluckin & Co. v. Int'l Playtex Corp., 407 F.2d 177, 178 (2d Cir. 1969) (finding special circumstances where "forum shopping alone motivate[s] the choice of the situs for the first suit"); Rayco Mfg. Co. v. Chicopee Mfg. Corp., 148 F. Supp. 588, 593-94 (S.D.N.Y. 1957) (deferring to the second jurisdiction because forum shopping motivated the plaintiff's choice of New York). Finally, the Tort and Contract Claims are not so inextricably intertwined with the Declaratory Claims so as to require a court adjudicating one group to reach a conclusion about the other. As a result, they can proceed in parallel litigation before separate courts. We therefore conclude that, under the circumstances presented in this case, it was an abuse of discretion for the New York District Court to adjudicate the Tort and Contract Claims that

49

had first been filed, and were in the process of being adjudicated, in the Texas District Court.

## II. Motion to Amend the Pleadings

Before we can address the remaining issues on appeal, we must turn to the plaintiffs' contention that the district court erred in denying their motion to amend the complaint seeking, in relevant part, to add another declaratory claim that the 1997 Transaction did not, in economic substance, constitute a "true sale" of the gas, such that BGT never acquired a legal ownership interest in the gas and could not therefore grant BofA a valid security interest in that property. As the plaintiffs point out, if we were to reverse the district court's judgment on this issue, we must also vacate and remand as to the remaining issues on appeal -- a finding by the district court on remand that the transaction did not constitute a true sale would, the plaintiffs contend, render the defendants' ownership and security interests void and thus compel a finding in the plaintiffs' favor on the remaining Declaratory Claims and Counterclaims. Such a remand is unnecessary in this case, however, because we conclude that leave to amend the complaint was properly denied.

We ordinarily review a district court's denial of a motion to amend the pleadings for abuse of discretion. Gorman v. Consol. Edison Corp., 488 F.3d 586, 592 (2d Cir. 2007); Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001). However, "if the denial of leave to amend is based upon a legal

50

interpretation we review it de novo."  Gorman, 488 F.3d at 592 (alterations and internal quotation marks omitted).

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend the pleadings should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."  Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993).  We have referred to the prejudice to the opposing party resulting from a proposed amendment as among the "most important" reasons to deny leave to amend.  State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981) ("Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party.").  Amendment may be prejudicial when, among other things, it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute."  Id.

The defendants contend that because the plaintiffs' motion to amend was not made until "three years after they filed their complaint and only after defendants moved for summary judgment," the district court was correct to deny the plaintiffs' "belated attempt to inject a new legal theory" into the case on grounds of undue delay and prejudice.  Appellees' Br. 59-60.  However, instead of denying the motion as untimely, the court

51

denied it on the ground that the proposed amendment would have been "futile," AEP I, 2007 WL 2428474 at *8, 2007 U.S. Dist. LEXIS 63421, at *24, based on its conclusion that "the record does not permit a finding that what the Bank of America did was a sham," Transcript of Record at 49, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Jan. 31, 2007).  Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact.  See Milanese, 244 F.3d at 110-11.

It is not altogether clear whether the district court's ruling was based upon a legal interpretation of the plaintiffs' proposed claim or on a factual determination of the claim's ability to withstand summary judgment, which may affect our standard of review.  See, e.g., Gorman, 488 F.3d at 592 (reviewing denial of motions for leave to amend de novo where district court "denied the motions . . . as futile based on [its] interpretation of the [statute under which the proposed claims were purportedly brought]"); Milanese, 244 F.3d at 110 (reviewing for abuse of discretion district court's determination that amendment, sought in response to summary judgment motions, would be futile because the record did not enable the proposed claim to withstand summary judgment).  We need not resolve that question, however, because we decline to affirm the district court's ruling on the ground of futility.

52

Based on the record before us, we are unable to conclude that the evidence adduced by the plaintiffs on summary judgment was insufficient to create a triable issue of fact as to whether the Bammel Gas transaction was a sham intended, in sum and substance, to enable Enron to inflate its year-end revenues fraudulently while hiding the true extent of its liabilities and therefore did not involve a "true sale" of the Storage Gas to BGT. On the other hand, doubts have also been raised as to whether the plaintiffs' proposed "no true sale" claim is a legally cognizable theory that would enable them to void the entire transaction and BofA's corresponding security interest therewith. In particular, it is open to question whether a finding that the transaction did not constitute a "true sale" for accounting purposes would necessarily compel the conclusion that it did not effect a legal transfer of property rights under the parties' agreements. And there is a further open issue as to whether the plaintiffs may be estopped from asserting that the transaction was a sham in light of their participation in the 2001 restructuring of the transaction and extensive due diligence in connection therewith.

We need not reach these difficult issues, however, because we conclude that the denial of AEP's motion to amend its pleadings was not an abuse of discretion. It would be futile to remand to the district court for it to make a discretionary ruling as to which its disposition is so clearly sound. The plaintiffs filed the motion to amend on October 25, 2006, three

years after the commencement of the lawsuit and several months after cross-summary judgment motions had been filed. As the plaintiffs concede on appeal, the resolution of their proposed "no true sale" claim may well have been dispositive of all other claims and counterclaims that had, until then, been the subject of extensive discovery and litigation between the parties. And at the time the plaintiffs sought to introduce this new claim, the defendants had already filed summary judgment papers, including in support of their motion and in opposition to the plaintiffs' motion, consisting of thousands of pages addressing the existing claims and counterclaims at issue. In other words, the impact of the proposed new claim on the existing proceedings would have been substantial. Its assertion would undoubtedly have required the defendants "to expend significant additional resources" to defend and would have "significantly delay[ed] the resolution of the dispute." Block, 988 F.2d at 350.

The plaintiffs offer a credible reason for their delay: that they were estopped from challenging BGT's ownership of the gas until the reversal of the Texas state court judgment in August 2006. The fact that there may have been good reason for them to have acted as they did is not alone sufficient to discount the significant prejudice resulting from permitting them to file their amended complaint in light of the circumstances presented, the length and complexity of these proceedings, and the late stage of litigation at which the motion was made. We therefore conclude that it was not an abuse of discretion for the

54

district court to deny the motion to amend. See Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend as "especially prejudicial given the fact that discovery had been completed and [the defendant] had already filed a motion for summary judgment"); see also Krumme v. WestPoint Stevens, Inc., 143 F.3d 71, 88 (2d Cir. 1998) (same where "case was near resolution and discovery had been completed").

We therefore affirm the district court's denial of the plaintiffs' motion to amend the complaint to add the "no true sale" claim.

### III. Summary Judgment as to the Plaintiffs' Declaratory Claims and BofA's Related Counterclaims

The plaintiffs -- AEP, HPL, and HPLR -- have asserted six claims (Counts I-VI of their Second Amended and Supplemental Complaint) seeking declarations that the defendants may not foreclose on or otherwise interfere with the plaintiffs' right to use the Storage Gas in the Storage Facility, that BofA's security interest is limited to the "personal property" natural gas contained in the Storage Facility as of May 2001, and that the defendants released or waived their rights to the gas under the Operative Agreements by virtue of the Enron Settlement Agreement.

Following oral argument before it, the district court concluded that defendant BofA held a "valid, presently-enforceable security interest in 55 billion cubic feet of gas

55

that was not subordinated in the 2001 transaction in any way." AEP I, 2007 WL 2428474, at *1, 2007 U.S. Dist. LEXIS 63421, at *5. The court further concluded that Enron's petition in bankruptcy constituted a default under the Operative Agreements, and that the Enron Settlement Agreement that resolved BofA's claims in the bankruptcy court did not affect BofA's right to enforce its security against the plaintiffs. Id., 2007 WL 2428474, at *1, 2007 U.S. Dist. LEXIS 63421, at *5. The district court therefore granted summary judgment to the defendants on all of the Declaratory Claims. It also granted summary judgment in BofA's favor on its counterclaims for conversion, breach of bailment, and replevin. Id., 2007 WL 2428474, at *2, 2007 U.S. Dist. LEXIS 63421, at *6-*7.[12]

For the reasons set forth below, we agree with the district court that BofA retained a valid security interest in the Storage Gas under the Operative Agreements that vested upon Enron's bankruptcy, and that the plaintiffs' refusal to return the gas thereafter constituted conversion. We therefore affirm the grant of summary judgment to BofA on the plaintiffs' Declaratory Claims and on the counterclaims for conversion, breach of bailment, and replevin.

A. Standard of Review

---

[12] The conversion-based counterclaims, being in response to the plaintiffs' Declaratory Claims, had been transferred by the Texas District Court and were properly before the New York District Court for adjudication.

We review the district court's grant of summary judgment de novo, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (citation and internal quotation marks omitted). "Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Oneida Indian Nation of N.Y. v. Madison County, 605 F.3d 149, 156 (2d Cir. 2010) (alteration and internal quotation marks omitted); see also Fed. R. Civ. P. 56(c).

B. The Use of Extrinsic Evidence

The parties agree that the relevant transaction documents are governed by Texas law.[13] They dispute, however, whether these agreements are ambiguous on their face, such that

[13] However, section 10 of Appendix B to the Participation Agreement, which recites the governing provisions for all of the Operative Agreements, provides that, unless otherwise stated, the Participation Agreement, the Security Agreement, and the Guaranty "shall be governed by and interpreted in accordance with the laws of the State of New York" and the Pressurization Agreement, Sale Agreement and Marketing Agreement "shall be governed by the laws of the State of Texas." 2001 Participation Agreement, app. B § 10 (emphasis removed). In addition, the Enron Settlement Agreement is also governed by New York law. And the Right To Use Agreement and the Consent -- to which the parties apparently refer in stipulating to the use of Texas law -- are expressly governed by Texas law, with the exception of the "rights, duties, obligations, benefits, protections, and immunities of the Trustee" under the Consent, which "shall be governed by the laws of the State of New York." Consent § 12(d) (emphasis removed).

Because Texas law and New York law are substantially similar in the relevant respects, this distinction does not affect our resolution of the issues concerning these agreements on appeal.

57

extrinsic evidence is necessary to determine the parties' intent.

Under Texas law, whether a contract is ambiguous is a question of law for the court to decide "by looking at the contract as a whole in light of the circumstances present when the contract was entered." Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983). A contract is ambiguous if it is subject to more than one reasonable interpretation. See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). Only if a contract is ambiguous on its face or when applied to the context at hand may extrinsic evidence be considered to explain the terms of the contract. Id. Of course, a contract is not rendered ambiguous simply because the parties disagree about its meaning. Seagull Energy E&P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006). When there is conflicting extrinsic evidence, summary judgment is inappropriate. See Sec. Sav. Ass'n v. Clifton, 755 S.W.2d 925, 931 (Tex. App. 1988).[14]

[14] New York law is substantially similar to Texas law in this regard. Under New York law, "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 570, 780 N.E.2d 166, 171, 750 N.Y.S.2d 565, 570 (2002). On the other hand, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc., 28 A.D.3d 175, 177, 808 N.Y.S.2d 70, 73 (1st Dep't 2006) (citations and internal quotation marks omitted). Only where a contract is ambiguous may extrinsic evidence be used to determine the parties' intent. Greenfield, 98 N.Y.2d at 569, 780 N.E.2d at 171, 750 N.Y.S.2d at 569. In such a circumstance,

Based on our review of the Operative Agreements, we conclude that there is no indication that these agreements are ambiguous on their face or in the context of this dispute, either individually or when read together. The district court therefore properly declined to consider extrinsic evidence in interpreting these contracts.

C. The Scope of the Parties' Rights Under the Operative Agreements

"If there is no ambiguity, the construction of the written instrument is a question of law for the court." Myers v. Gulf Coast Minerals Mgmt., 361 S.W.2d 193, 196 (Tex. 1962); see also Seagull, 207 S.W.3d at 345. The "primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract." Seagull, 207 S.W.3d at 345. "To discern this intent, we 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" Id. (emphasis in original) (quoting Coker, 650 S.W.2d at 393). In doing so, "'[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" Id. (quoting Coker, 650 S.W.2d at 393). Where contemporaneous documents exist, these documents should be construed together to discern the parties'

summary judgment is inappropriate. See Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909, 350 N.Y.S.2d 895, 898 (1973).

intent. See Tex. Commerce Bank Nat'l Ass'n v. Nat'l Royalty Corp., 799 F.2d 1081, 1083 (5th Cir. 1986).[15]

The plaintiffs urge us to conclude that the district court erred in deciding that the Operative Agreements granted defendant BofA a valid, enforceable security interest in the gas that gained priority over the plaintiffs' rights upon Enron's bankruptcy. They point to the fact that the Right To Use Agreement, executed between HPL and Enron with BofA's consent, gave HPL the right to "quiet enjoyment" of the Storage Gas "free of adverse claims of Third Parties, of any kind or nature" for the duration of the sublease. Appellants' Br. 75 (quoting Right To Use Agreement § 1.01 (definition of "Quiet Enjoyment")). In order to guarantee such unfettered use of the gas, they contend, Enron (through LeaseCo) agreed to use only "Exchange Gas," not the Storage Gas contained in the Storage Facility, to satisfy any obligations to BofA that may arise under the Operative Agreements. Id. (citing Right To Use Agreement § 8.01). The plaintiffs also note that in the Consent itself, BofA expressly

---

[15] Similarly, under New York law, when the terms of a contract are clear and unambiguous, the construction of the contract presents a question of law to be determined by the court. Town of Harrison v. Nat'l Union Fire Ins. Co., 89 N.Y.2d 308, 316, 675 N.E.2d 829, 832, 653 N.Y.S.2d 75, 78 (1996). "[A]greements are construed in accord with the parties' intent." Greenfield, 98 N.Y.2d at 569, 780 N.E.2d at 171, 750 N.Y.S.2d at 569. Accordingly, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. at 569, 780 N.E.2d at 171, 750 N.Y.S.2d at 569. Where the terms of a contract are clear, the court may properly grant summary judgment as a matter of law. See Wesolowski, 33 N.Y.2d at 172, 305 N.E.2d at 909, 350 N.Y.S.2d at 898.

released plaintiffs HPL and HPLR "'from all liabilities and obligations under the Operative Agreements, whether now or in the future existing or arising,'" and agreed to enforce the obligations imposed by these agreements "'solely against'" Enron. Appellants' Br. 76 (quoting Consent § 2(g)). The plaintiffs argue that, together, these provisions evince an intent to give HPL and HPLR unfettered use of the gas to the exclusion of any preexisting rights or security interest of BofA, and to direct all recourse in any event solely against Enron. We do not think, though, that this piecemeal reading of the transaction documents accurately reflects the manifest intent of the parties.

It seems to us clear from the plain language of the Operative Agreements that the intent of the Right To Use Agreement and the Consent was to provide the plaintiffs with unfettered use of the Storage Gas for the duration of the sublease in all ordinary circumstances absent an event of default -- the same rights as HPL had under the original 1997 agreements, before HPL was sold to AEP. Once a default occurred when Enron filed its petition in bankruptcy, see 2001 Guaranty § 5.01(c) ("A 'Guaranty Default' shall exist if . . . Enron or any of its Principal Subsidiaries shall become the subject of a Bankruptcy Event."[16]) (emphasis removed); 2001 Participation Agreement

---

[16] A "Bankruptcy Event" occurs with respect to an entity if

(a) such [entity] shall generally not pay such [entity]'s debts as such debts become due . . . ; or (b) any proceeding shall be instituted by or against such [entity] seeking to adjudicate such [entity] as

61

§ 8.01(e) (stating that an event of default includes when "[a] Guaranty Default occurs"), there is nothing in the documents that purports to negate or subordinate the defendants' rights, remedies, or interest in the gas that they would otherwise have under the Operative Agreements.

The Right To Use Agreement, which grants HPL the right to use the gas for the duration of the sublease, provides that "notwithstanding the terms, provisions and restrictions in any [of the Operative Agreements], LeaseCo . . . will cause and allow[ the Storage Gas] to be available to HPL at the Storage Facility for HPL's right to Quiet Enjoyment at all times during the [t]erm [of the sublease]." Right to Use Agreement § 2.01(b). The plaintiffs are correct that pursuant to this agreement, LeaseCo granted HPL "Quiet Enjoyment" of the Storage Gas "free of adverse claims of Third Parties, of any kind or nature, in, to or with respect to the [Storage] Gas, or any part thereof, that interfere with, restrict or impede the Enjoyment of the [Storage]

> bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, rearrangement, adjustment, protection, relief, or recomposition of such [entity] or such [entity]'s debts under any Bankruptcy Law, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for such [entity] or for any substantial part of such [entity]'s property and, in the case of any such proceeding instituted against such [entity] (but not instituted by such [entity]), shall not be controverted within 45 days and shall remain undismissed or unstayed for a period of 90 days after such proceeding is filed.

2001 Participation Agreement, app. A (definition of "Bankruptcy Event").

Gas." Id. § 1.01 (definition of "Quiet Enjoyment"). But we do not read this clause as restricting the existing security interest held by BofA in the gas. The parties explicitly carved out the existing security interest from this prohibition by designating it a "Permitted Lien" under the agreement, "[t]he existence of [which] shall not be a breach by LeaseCo of [its obligation to provide HPL with quiet enjoyment of the gas]." Id. § 2.01(b); see also id. § 1.01 ("'Permitted Liens' means . . . [inter alia] the Lien of the Existing Security Agreement." (emphasis removed)). The Pressurization Agreement appears to reinforce this understanding by providing, in the covenants, that "[t]he Trustee shall not create any Lien on the Storage Gas (other than the Lien in favor of [BofA] under the Security Agreement)." 2001 Pressurization Agreement § 5.02(a).

The Right To Use Agreement was subject to BofA's consent. See Consent at 2 ("[T]he execution and delivery of this Consent by each of the Consent Parties [including BofA] is a condition precedent to the effectiveness of . . . the Sublease and the Right to Use Agreement."). However, the Consent executed by BofA is not helpful to the plaintiffs. It makes clear that the scope of this consent extended to "the use of the [Storage] Gas by [HPL] as contemplated by the Right to Use Agreement . . . [and] to any and all agreements related thereto," but only "so long as such related agreements do not increase the obligations or reduce the rights of the Trustee . . . or BofA under the Operative Agreements." Consent § 2(a)(iii) (emphasis added).

63

Accordingly, BofA consented to the plaintiffs' right to use the gas only to the extent that this arrangement did not alter, to the defendants' detriment, the defendants' existing rights and obligations under the Operative Agreements then in place; and by implication, then, BofA withheld its consent to any aspect of the right-to-use arrangement that would have the effect of increasing the defendants' obligations or, more importantly, reducing their rights to the gas in any way under the Operative Agreements.

Indeed, section 11 of the Consent unambiguously forecloses the plaintiffs' argument that the parties intended by these agreements to subordinate BofA's security interest to the plaintiffs' rights in the gas. It provides that "[f]or avoidance of doubt, nothing herein shall impair the lien and security interest of BofA under the Security Agreement or, except as expressly set forth in Section 2 hereof, reduce the rights and remedies of BofA under the Security Agreement." Consent § 11. The only limitation set forth in "section 2 [t]hereof" on the rights and remedies of BofA under the Security Agreement was that prior to exercising these rights upon an event of default, BofA and the Trustee were required first to afford the plaintiffs notice of the default and an opportunity to cure it.[17]

_____

[17] In this regard, any reliance the plaintiffs may place on the exception clause of section 11, providing that the terms set forth in section 2 of the Consent may act to "reduce the rights and remedies of BofA under the Security Agreement," is therefore misplaced. Section 2 of the Consent grants the consent to the Right To Use Agreement and provides, in relevant part, for notice and cure rights to the plaintiffs in the event of a default. See Consent §§ 2(b)(ii)-(iii) (providing that "[i]n the event of a default . . . [HPL] shall have the right (but not the obligation)

64

Accordingly, we look next to the Security Agreement to determine the rights and remedies of BofA with respect to the gas. Section 3 of the Security Agreement delineates the relative priority of the parties' rights and interest in the gas before and after a default: "With respect to the [secured portion of the Storage Gas] only, the Security Interest of the Secured Party therein . . . until the Trustee (or its designee) exercises its rights under Section 5.02 of the Guaranty, shall be subordinate to [the plaintiffs'] right to borrow and use such Natural Gas in accordance with the terms of the Pressurization Agreement." 2001 Security Agreement § 3(c)(ii)(emphasis added). Section 6 of the agreement, entitled "Remedies upon Event of Default," further clarifies the interplay between the parties' respective rights to the gas before and after a Guaranty Default occurs:

> Notwithstanding any provisions to the contrary in this Agreement, so long as no Guaranty Default shall have occurred and be continuing, neither the Secured Party [BofA]

to cure such Default within the applicable cure periods," and that the Trustee "shall not exercise any remedies under the Operative Agreements in respect of any Default" unless and until written notice of default and an opportunity to cure has been afforded to HPL, and HPL has not cured); see also id. § 2(c) (same rights and obligations with respect to BofA).

Therefore, section 2 of the Consent "reduces" the rights and remedies of BofA only insofar as it forestalls the exercise of these rights and remedies in the event of default until after notice and an opportunity to cure has been provided. It does not, as the plaintiffs contend, negate these rights and remedies altogether or subordinate them absolutely to the consent to use. And in fact, section 2 of the Consent further stipulates that the parties have "agreed and acknowledged that any 'Guaranty Default' . . . is an Event of Default which could affect [the plaintiffs'] rights under or pursuant to the Right to [U]se Agreement." Id. § (2)(c)(i).

65

> nor any Note Purchaser or Bank Lender shall exercise its remedies (and the Note Purchasers and Bank Lenders shall not request the Secured Party to exercise such remedies) under any provision of this Agreement or otherwise available at law or in equity against or affecting the Storage Gas. . . . Upon the occurrence of a Guaranty Default, the Secured Party's rights and remedies with regard to the [secured portion of the Storage Gas] shall be limited to those specified in Section 5.02 of the Guaranty.

Id. § 6(b) (emphasis added).

The Security Agreement thus provides that the security interest of BofA in the Storage Gas is subordinate to HPL's right to use this gas, but only until a Guaranty Default occurs. Thereupon, BofA's exclusive recourse lies in the Trustee's exercise of its rights and remedies under section 5.02 of the Guaranty (or in BofA's assumption and exercise of these rights itself as a representative of the Trustee, see id. § 6(a)(ii)). Section 5.02 of the Guaranty permits the Trustee, "[u]pon the occurrence and during the continuance of a Guaranty Default, . . . to exercise all rights and remedies available at law, in equity, by statue, by agreement or otherwise including, without limitation, the right to give Enron the Settlement Notice." 2001 Guaranty § 5.02. Upon such notice, if Enron fails to cure the default by delivering Exchange Gas of equivalent value to the Trustee, "Enron shall, at the Trustee's request (at the direction of [BofA]), cause the Trustee to have such access and rights to the Storage Facility . . . to permit the Trustee or its designee to withdraw Storage Gas from the Storage Facility." Id. § 5.02(b). In addition, both the Guaranty and the

66

Pressurization Agreement unambiguously provide that upon the Trustee's exercise of its rights and remedies under section 5.02 of the Guaranty, the Pressurization Agreement -- and therefore the plaintiffs' rights to use the gas -- terminates. See id. § 5.03(b); 2001 Pressurization Agreement § 6.03(b).

In sum, we conclude that the Operative Agreements, when read together, provided the plaintiffs with the right to quiet enjoyment and use of the gas for the duration of the sublease so long as no event of default had occurred or any default had been cured. Upon an event of default, the plaintiffs' right to use the gas was subordinated to BofA's security interest and the defendants became entitled to exercise their rights and remedies under the Operative Agreements to foreclose on this interest. And we find nothing in the Operative Agreements that acted in the 2001 Transaction to negate or subordinate the security interest that BofA was granted in the Storage Gas in the event of a default.

We have considered the remainder of the plaintiffs' arguments based on the law of contracts and find them without merit.[18]

---

[18] For example, the plaintiffs cite section 8.01 of the Right To Use Agreement in support of their claim that BofA relinquished all rights to the Storage Gas in the 2001 Transaction and was required thereafter to look only to "Exchange Gas" from Enron in satisfaction of any obligation. But this section cannot reasonably be read as broadly as the plaintiffs suggest. Section 8.01 states that "LeaseCo shall use only Exchange Gas to satisfy its obligations under Article III of the Pressurization Agreement to make withdrawals of Natural Gas from the Storage Facility." Right To Use Agreement § 8.01 (emphasis added). Article III of the Pressurization Agreement required

67

D. Summary Judgment as to The Declaratory Claims

_____

LeaseCo to withdraw the Storage Gas from the Storage Facility pursuant to a fixed schedule over a period of months in 2004 -- or, at its option, permit LeaseCo to provide Exchange Gas instead -- to give to Enron to sell on the open market. Enron would then remit the proceeds of the sale to BGT so that BGT could repay to BofA the principal amount of the $218 million loan. Article III thus provided the mechanism by which Enron originally intended to repay the BofA loan at its maturity in 2004. This mechanism was retained intact from the 1997 Transaction to the 2001 Transaction, regardless of the fact that the 2001 Transaction granted HPL the right to use the Storage Gas that was supposed to be sold in 2004 for the next thirty years.

Accordingly, in light of this conflict, section 8.01 of the Right to Use Agreement alters this mechanism in one simple way: it makes the option to use Exchange Gas to satisfy the 2004 loan obligation that was present in the 1997 Transaction mandatory under the 2001 agreements. This change was intended to provide LeaseCo an alternate way of satisfying the 2004 loan obligation without withdrawing the Storage Gas and thereby impacting HPL's rights to continued use of this gas for the duration of the 30-year sublease. By its terms, then, this provision requires LeaseCo to use Exchange Gas to satisfy its obligation to BofA only in this specific instance; it does not touch upon the parties' rights and obligations in any other event.

Similarly, the plaintiffs quote the Consent in support of their assertion that BofA released HPL "from all liabilities and obligations under the Operating Agreements, whether now or in the future existing or arising," and agreed "to enforce payment and performance . . . solely against LeaseCo and [Enron]" in an effort to subordinate BofA's security interest in the gas and vest the plaintiffs with exclusive rights to use in all circumstances. See Consent § 2(g). But the plaintiffs neglect to point out that this provision, by its terms, refers only to the specific bundle of obligations assigned to LeaseCo by HPL in the Assignment and Assumption Agreement entered into as part of the 2001 Transaction restructuring. See id. ("In connection with the assignments referred to in clause (a)(i) of this Section 2 [referring to the 'Assigned Obligations' under the Assignment and Assumption Agreement]. . . ."). It therefore does nothing more than confirm that, pursuant to this assignment, LeaseCo now stands in the former shoes of HPL for purposes of the 2001 Transaction. It does not affect the defendants' rights and remedies in any other respect nor, certainly, in the event of a default.

68

We agree with the district court that Enron's filing in bankruptcy constituted an event of default under the Operative Agreements and that, following this default, BofA had a "valid, presently-enforceable security interest in [the] gas that was not subordinated in the 2001 transaction in any way." AEP I, 2007 WL 2428474, at *1, 2007 U.S. Dist. LEXIS 63421, at *5. The terms of the parties' agreements make clear that this security interest was subordinated to the plaintiffs' rights to use the gas only until the Trustee exercised its rights and remedies under section 5.02 of the Guaranty in the event of a default. Upon an event of default, however, the plaintiffs were entitled, pursuant to the Consent, to receive notice of and an opportunity to cure the default before the defendants could proceed to exercise their rights and remedies under the Security Agreement and the Guaranty to foreclose on the gas. Accordingly, following the lift of the bankruptcy stay in the wake of the Enron Settlement Agreement, the defendants sent Notices of Default and Settlement Notices to the plaintiffs, and the plaintiffs chose neither to cure the default nor (as was their option under the Purchase Option Agreement) to purchase the Storage Gas outright. At this point, then, pursuant to the contracts, the defendants had the superior right to foreclose upon and withdraw the gas.

We also agree with the district court's conclusion that the Enron Settlement Agreement did not affect the defendants' ability to enforce their rights with respect to, and security interest in, the gas. See id., 2007 WL 2428474, at *1, 2007 U.S.

69

Dist. LEXIS 63421, at *5. The plaintiffs argue that as part of the Enron Settlement Agreement, the defendants released any and all claims against Enron relating to the Bammel Gas transaction and thereby extinguished any subsequent right of recourse they may have had under the Operative Agreements against the gas. But the Settlement Agreement provides to the contrary.

The Settlement Agreement allows the defendants' proofs of claim against Enron relating to the Bammel Gas transaction to be admitted in the bankruptcy proceedings, but only on the condition that the defendants' recovery on these claims must come solely from the proceeds of the sale of the Storage Gas -- which the defendants were then entitled to withdraw and sell under the terms of the Operative Agreements in any event -- and not from any other asset controlled by Enron or at issue in the bankruptcy. In order to effectuate this recovery, the order confirming the Settlement Agreement explicitly lifted the automatic bankruptcy stay "for the sole purpose of allowing [the defendants] to attempt to realize upon the value of the [Storage] Gas," including by sending Settlement Notices and Notices of Default to Enron and to the plaintiffs and thereafter allowing the plaintiffs an opportunity to cure prior to foreclosing on the gas. Order Approving Settlement Agreement at 9, In re Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. Jan. 15, 2004). In return for the allowance and settlement of these claims in this manner, the defendants agreed to release any other claims against Enron

relating to the Bammel Gas transaction that may then exist or thereafter arise.

The Settlement Agreement therefore does not alter or extinguish the defendants' rights under the Operative Agreements to foreclose on and withdraw the Storage Gas following an event of default.  Nor does it release the defendants' interest in or claims against the gas in any way.  It does no more than limit the defendants' recovery on their allowed claims against Enron to the proceeds of the sale of this gas pursuant to the terms of, and in accordance with their rights under, the Operative Agreements.  In doing so, it insulates any other assets held by Enron or otherwise at issue in the bankruptcy proceedings from being the target of the defendants' recovery on their allowed claims.

It may be worth noting in this connection that the plaintiffs do not own the Storage Gas; BGT does.  BGT leased the rights to use this gas to LeaseCo in the 2001 Transaction, and LeaseCo in turn subleased those rights to HPL.  But once Enron filed for bankruptcy, the plaintiffs' rights to use this gas were effectively extinguished.  BGT regained the right, as owner, to control and withdraw the gas pursuant to the terms of the Operative Agreements.  And BofA gained the right to foreclose upon its security interest in the gas.

Moreover, pursuant to the Enron Settlement Agreement, the defendants' recovery on their allowed claims against Enron is contingent on their exercise of these rights.  The plaintiffs

71

nonetheless continue to retain physical control over the Storage Gas and the Storage Facility. Despite a continuing event of default, the plaintiffs have refused the defendants access to the gas in order to exercise their rights. Thus, contrary to the plaintiffs' arguments, the defendants are not now seeking to recover directly against the plaintiffs for the value of their claims against Enron that were released through the settlement in bankruptcy. Instead, the defendants are simply attempting to exercise their contractual rights.

Finally, we agree with the district court that the gas contained in the Storage Facility is properly characterized as "personal property" natural gas and that the plaintiffs are estopped as a matter of law from claiming otherwise.[19] AEP I, 2007 WL 2428474, at *15-*17, 2007 U.S. Dist. LEXIS 63421, at *43-*48. As BofA concedes, its security interest "is limited to personal property natural gas." Id., 2007 WL 2428474, at *15, 2007 U.S. Dist. LEXIS 63421, at *44. And its conversion, bailment, and replevin counterclaims, as a matter of law, may only lie with regard to personal property. See Int'l Freight Forwarding, Inc. v. Am. Flange, 993 S.W.2d 262, 267 (Tex. App.

_____

[19] In their briefs on appeal to this Court, the parties address this issue in connection with the question of damages due to BofA on the counterclaims, rather than in connection with the district court's rulings as to liability on the Declaratory Claims. Notwithstanding this fact, we address this argument in this section of our opinion, as part of our discussion of the plaintiffs' Declaratory Claims, because this is the posture in which it arose in the district court and because it relates to the district court's grant of summary judgment in favor of BofA on Count I of the Declaratory Claims. See AEP I, 2007 WL 2428474, at *17, 2007 U.S. Dist. LEXIS 63421, at *48-*49.

72

1999) (bailment); Lighthouse Church of Cloverleaf v. Tex. Bank, 889 S.W.2d 595, 599 n.4 (Tex. App. 1994) (conversion); Bull v. Jones, 29 S.W. 804, 806, 9 Tex. Civ. App. 346, 349 (1894) (replevin). The plaintiffs contend that the natural gas contained in the Storage Facility constitutes "real property" rather than "personal property," and because the defendants' interest in the gas is limited to "personal property," they have no entitlement to the Storage Gas.

As the district court found, however, the plaintiffs have repeatedly represented, in both the transaction documents and in tax and regulatory filings, that the natural gas contained in the Storage Facility constitutes "personal property" natural gas and that no "native gas" -- or "real property" natural gas -- existed in the facility after 1996. See, e.g., 1997 Participation Agreement § 5.01(m) ("The entire quantity of Natural Gas to be sold . . . constitutes . . . personal property of the Sellers."); see also AEP I, 2007 WL 2428474, at *16, 2007 U.S. Dist. LEXIS 63421, at *44-*45 ("From March 1996 to February 2003, HPL filed monthly G-3 Forms with the Texas Railroad Commission, where it reported that there was no native gas present in the Bammel Reservoir."). The plaintiffs cannot now seriously claim that the Storage Facility contains only "real property" natural gas to which the defendants have no entitlement. See Coffey v. Singer Asset Fin. Co., 223 S.W.3d 559, 570 (Tex. App. 2007) ("[A] party to a contract [may not]

73

take a position inconsistent with the contract's provisions, to the prejudice of another.").

We further conclude that the two recently created regulatory filings, not submitted by the plaintiffs to the district court until after summary judgment motions were filed, which appear to assert that the Storage Facility contains mostly "native gas," and the plaintiffs' expert report purporting the same conclusion, are insufficient to create a genuine issue of material fact on this question, especially in light of our conclusion regarding the inability of the plaintiffs to make such an assertion contrary to their previous representations in this regard.  See generally Margo v. Weiss, 213 F.3d 55, 60-61 (2d Cir. 2000) ("[P]laintiffs cannot defeat a motion for summary judgment by responding with affidavits recanting that earlier testimony."); Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991) ("[A] party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); UBS AG v. HealthSouth Corp., 645 F. Supp. 2d 135, 145 n.14 (S.D.N.Y. 2008) ("Just as a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony, so too [a party] cannot [in litigation] take a position of convenience contrary to its prior statements to [regulatory authorities]." (citations and internal quotation marks omitted)).

We therefore affirm the district court's grant of summary judgment to the defendants on the plaintiffs' Declaratory Claims.

E.  Summary Judgment as to the Declaratory Counterclaims

In light of its conclusion that the defendants had a superior existing right to the gas, the district court granted summary judgment to BofA, appearing as BONY's representative for purposes of the counterclaims, on its counterclaims for conversion, breach of bailment agreement, and replevin based on the plaintiffs' refusal to relinquish the gas to the defendants when asked.  The court concluded that the plaintiffs "converted the gas by refusing to turn it over to BofA when BofA requested it."  AEP II, 2007 WL 4458117, at *1, 2007 U.S. Dist. LEXIS 93022, at *2-*3.

Under Texas law, a bailment is created when (1) the delivery of personal property by one person to another is made in trust for a specific purpose, (2) there is an acceptance of delivery, (3) there exists an express or implied contract that the trust will be carried out, and (4) an understanding exists under the terms of the contract that the property will be returned to the transferor or dealt with as the transferor directs.  See Int'l Freight Forwarding, 993 S.W.2d at 267.  A plaintiff who establishes breach of a bailment contract may gain relief through an action for conversion.  Id. at 269.

Conversion, in turn, is the "wrongful assumption and exercise of dominion and control over the personal property of

another to the exclusion of, or inconsistent with, the owner's rights." Burns v. Rochon, 190 S.W.3d 263, 267-68 (Tex. App. 2006) (citing Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 446 (Tex. 1971)). To establish conversion, a plaintiff must prove that: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return it. Id. at 268.

We agree with the district court that summary judgment as to these counterclaims is appropriate. Upon the occurrence of the Guaranty Default, the plaintiffs' superior right to the Storage Gas was extinguished and the defendants were entitled to possession of the gas under the Operative Agreements, subject to the notice and cure provisions. Once the plaintiffs had been provided with notice of the default and failed to exercise their option to cure, BofA became entitled, as the Trustee's representative, to exercise its right to take immediate possession of the Storage Gas. See 2001 Security Agreement § 6(a)(ii). And when BofA demanded access to the gas and AEP refused, that refusal therefore constituted conversion. Because wrongful intent is not an element of conversion under Texas law, see Winkle Chevy-Olds-Pontiac, Inc. v. Condon, 830 S.W.2d 740,

76

746 (Tex. App. 1992), the plaintiffs' subjective belief that BofA was not entitled to the gas does not preclude their liability.

IV. Summary Judgment as to Damages

The plaintiffs identify several errors that they contend the district court made in calculating the damages due to BofA in connection with the counterclaims.  They assert that the district court erred as a matter of law in awarding damages to BofA in excess of the amount outstanding on its loan and without taking into account BofA's obligation to mitigate these damages. They also assert an error as to the date of conversion, which the district court fixed at May 14, 2004, but which the plaintiffs contend should have been July 22, 2002.  Finally, they contend that the district court improperly weighed conflicting evidence when it granted summary judgment as to the value of the gas and the costs of withdrawing this gas.  We find none of these arguments to be meritorious.[20]

A.  Damages In Excess of the Loan Amount

The plaintiffs contend that the district court erred in permitting BofA to recover damages in excess of the value of its secured loan.  The plaintiffs fail to account, however, for the fact that BofA asserted the counterclaims in its capacity as BONY's representative, as was its right under the Operative

_____

[20] As discussed in note 19, supra, the plaintiffs also contend that the district court erred in determining that the natural gas contained in the Storage Facility constitutes "personal property" natural gas for the purpose of assessing damages.  For the reasons set forth in our discussion of this issue in Section III(D), supra, we reject this argument.

77

Agreements. See Answer, Defenses and Counterclaims at 25, AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., No. 05 Civ. 4248 (S.D.N.Y. Jan. 26, 2006) (asserting counterclaims "as Administrative Agent . . . and as representative of the Trustee of the BGT"); 2001 Security Agreement § 6(a)(ii). Therefore, BofA was not limited to the value of its security interest with respect to the damages for conversion.

Under Texas law, "[a] plaintiff who establishes conversion is entitled to return of the property" or, in the alternative, "can sue for the value of the property." Winkle Chevy-Olds-Pontiac, Inc. v. Condon, 830 S.W.2d 740, 746 (Tex. App. 1992). If the plaintiff elects the latter, "actual damages are determined by the fair market value at the place and time of conversion together with legal interest thereon." Varel Mfg. Co. v. Acetylene Oxygen Co., 990 S.W.2d 486, 497 (Tex. App. 1999); see also Burns, 190 S.W.3d at 270 ("If the plaintiff in a conversion action elects to recover the value of the property, damages are typically determined by the fair market value at the time and place of conversion."). BGT, as the owner of the gas, was therefore entitled to bring suit by and through the Trustee for the full value of the converted property. It was not limited to the value of BofA's security interest.

As the district court explained, "this case is not about BofA's recovery of the value of the loan. The action was commenced to determine who has greater rights with regard to the gas, and damages are to be awarded to BofA based on the value of

78

the converted property, not based on the amount due on the loan." AEP II, 2007 WL 4458117, at *5, 2007 U.S. Dist. LEXIS 93022, at *15–*16 (emphasis in original). We agree and conclude that BofA was entitled to recover the full market value of the converted gas as of the date on which it was converted.

B. Obligation to Mitigate

The plaintiffs assert that the district court erred in failing to find that the defendants had a duty to mitigate damages and that they neglected to do so on two occasions. See AEP II, 2007 WL 4458117, at *6, 2007 U.S. Dist. LEXIS 93022, at *16. First, the plaintiffs contend that BofA failed to mitigate when it released its security interest in the 25 Bcf of gas sold by Enron to AEP during the 2001 Transaction restructuring, and that BofA should have ensured that the $94 million paid by AEP to Enron for this gas was thereafter given to BGT in partial repayment of the loan. Second, the plaintiffs contend that BofA failed to mitigate when it ceased pursuing its claims against Enron in bankruptcy and instead entered into the Enron Settlement Agreement in satisfaction of these claims. We disagree.

At the outset, the plaintiffs fail to explain why BofA, as a secured lender in the 1997 Transaction, should not have been permitted to voluntarily release part of its security in order to accomplish the 2001 restructuring, and why it would have been obligated to control the use of any proceeds from the sale of this gas paid to Enron by AEP. More importantly, they do not explain how BofA could have been expected to foresee and mitigate

79

unknown future damages years before the conversion took place. See, e.g., Trinity Universal Ins. Co. v. Fuller, 524 S.W.2d 335, 338 (Tex. App. 1975) (explaining that the duty to mitigate arises only once the victim of wrongdoing "has knowledge of the fact[s] which make avoidance of the consequences necessary," such as "knowledge of the wrongdoer's breach of contract prior to the occurrence of the damages").

The plaintiffs also fail to point to any authority for the proposition that an aggrieved party must mitigate damages when deprived of possession of its property through conversion. And in citing cases involving mitigation by a secured party, they continue to ignore the fact that BofA acts in the counterclaims as BONY's representative, and that its damages are not based upon the value of its security. See, e.g., Bank of N.Y. v. Amoco Oil Co., 35 F.3d 643, 659-60 (2d Cir. 1994) ("Generally, the duty to mitigate is a limitation on consequential damages," and where plaintiffs do not seek such damages, but seek damages for the value of converted property, mitigation is not required.).

The plaintiffs also fail to recognize that BofA did not "abandon" its claims relating to the Bammel Gas transaction against Enron in the bankruptcy, but instead settled those claims for value. And it is the recovery of that value -- through the withdrawal and sale of the Storage Gas -- that underlies the instant litigation. Their argument that BofA's recovery in this action "should be reduced by the amount it could have recovered

80

in the bankruptcy" had it not abandoned its claims, Appellants' Br. 88, is therefore inapposite.

C.  The Date of Conversion

The plaintiffs next contend that the district court erred in determining the date of conversion to be May 14, 2004, the date on which BofA demanded possession of the gas by means of letter to AEP and HPL following the lifting of the automatic bankruptcy stay in the wake of the Enron Settlement Agreement and after Enron, and the plaintiffs, had failed to cure the default in response to the Notices of Default and Settlement Notices. Rather, the plaintiffs contend, the date of conversion should be fixed at July 22, 2002, when BofA first demanded possession of the gas following Enron's bankruptcy and AEP refused, prompting the filing of the 2002 Texas state court action.[21]  Using the July 2002 date instead of the May 2004 date, the plaintiffs assert, would reduce the ultimate damage award by approximately $180 million.

Under Texas law, a cause of action for conversion accrues "upon the discovery of facts supporting the cause of action, or upon demand and refusal, whichever occurs first."

---

[21] The parties dispute whether the plaintiffs belatedly raised this issue in the district court for the first time on a motion for reconsideration, such that it should now be reviewed for abuse of discretion.  However, the district court nonetheless considered the merits of this argument in the first instance on the motion to reconsider.  We therefore review this issue de novo. See Lowrance v. Achtyl, 20 F.3d 529, 534 (2d Cir. 1994) (construing a denial of motion for reconsideration on the merits as "essentially an affirmance on the merits," and "review[ing] de novo the [court's] reconsideration, on a motion for reconsideration, of the merits of the summary judgment motion").

Nelson v. Am. Nat'l Bank, 921 S.W.2d 411, 415 (Tex. App. 1996). To establish conversion, a plaintiff must establish that "at the time of conversion, he was the owner of the property, had legal possession of it or was entitled to possession." Whitaker v. Bank of El Paso, 850 S.W.2d 757, 760 (Tex. App. 1993).

We agree with the district court that "BofA was not entitled to the gas in 2002, because BofA could not have taken possession of the gas until it served a Settlement Notice on Enron[ and] . . . BofA could not serve this Settlement Notice until 2004 when the stay in the Enron bankruptcy was lifted." AEP III, 2008 WL 925433, at *2, 2008 U.S. Dist. LEXIS 30587, at *7. During the pendency of the bankruptcy stay, BofA was not entitled to possession of the gas because it could not enforce its rights to take possession until after the stay was lifted. The Texas Court of Appeals effectively echoed this view when it vacated the 2003 state court judgment in favor of BofA on the grounds that it violated the automatic bankruptcy stay. Because BofA was not entitled to demand possession of the gas until after the stay was lifted in 2004, AEP's refusal of its demand prior to that point did not constitute conversion.

Once the stay was lifted, however, BofA was entitled to possession of the gas and to enforce its rights to gain that possession. Accordingly, shortly after the order lifting the stay was issued, BofA sent Notices of Default and Settlement Notices, in conformity with the terms of the Operative Agreements, to Enron and LeaseCo, with copies to AEP and HPL.

82

Enron did not perform its obligations under the Guaranty in response to those letters, nor did the plaintiffs exercise their options to cure the default or to purchase the gas. Accordingly, on May 14, 2004, BofA demanded that AEP withdraw and transfer custody of 55 Bcf of Storage Gas in the Storage Facility to BofA. AEP's refusal constituted conversion as of the date of BofA's demand. The district court therefore correctly set the date of conversion as May 14, 2004.

D.  The Value of the Natural Gas

The district court correctly determined that, under Texas law, BofA, as the representative of BONY (the Trustee of the owner of converted property), could elect between the return of the property and money damages. BofA elected money damages. Accordingly, the district court determined that BofA was entitled to $347,325,000, which was the Houston Ship Channel market value of the natural gas on the date of conversion, reduced by the reasonable costs of removal of the gas from the facility. See AEP II, 2007 WL 4458117, at *1, 2007 U.S. Dist. LEXIS 93022, at *3.

The plaintiffs do not dispute this calculation. Nor do they dispute the use of the Houston Ship Channel Index to determine the market price of the natural gas on the date of conversion. Indeed, they conceded this fact in the district court. See id., 2007 WL 4458117, at *4, 2007 U.S. Dist. LEXIS 93022, at *12 ("AEP does not dispute that the HSC price listed is an accurate reflection of the market price of natural gas on that

83

date."). The sole argument they advance on appeal is that the calculation of damages, as a general matter, is inherently inappropriate for summary judgment and that they submitted sufficient evidence to create a genuine dispute of material fact as to the valuation of the gas in this case.

But courts do routinely award damages that are readily calculable based on the undisputed facts on summary judgment. See, e.g., Atari, Inc. v. Games, Inc., 2005 WL 1053729, 2005 U.S. Dist. LEXIS 8129 (S.D.N.Y. May 4, 2005), amended on reconsideration on other grounds, 2005 WL 1294403, 2005 U.S. Dist. LEXIS 10457 (S.D.N.Y. May 31, 2005), aff'd, 164 F. App'x 183 (2d Cir. 2006); Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A., 315 F. Supp. 2d 347 (S.D.N.Y. 2003). Further, the dispute that the plaintiffs point to in this case is not one of fact, but of law: whether the defendants' interest in the gas was restricted, under the transaction documents, to "cushion gas" as opposed to "working gas" as a matter of law.

"If the plaintiff in a conversion action elects to recover the value of the property, damages are typically determined by the fair market value at the time and place of conversion." Burns, 190 S.W.3d at 270. The plaintiffs argue that the defendants' interest is restricted to "cushion gas," as opposed to "working gas." "Cushion gas," which has a much lower market value than "working gas" because it cannot be withdrawn from the facility, is the amount of gas that is necessary to pressurize a facility and that must be present at all times when

the facility is in use. "Working gas" is any gas in the facility above and beyond this amount that can be withdrawn for use at any time. Because cushion gas is the facility's bottommost gas and is often contained within porous rock, the plaintiffs contend, the process of removing this gas from the facility would cost millions of dollars, reducing its market value drastically, and they submitted an expert declaration to this effect.

However, the assumption underlying the plaintiffs' expert evidence regarding the market value of the gas -- that the gas should be considered exclusively "cushion gas" in nature -- appears to be flawed. The original Participation Agreement, which was amended and restated in the 2001 Transaction, identifies the gas at issue in the transaction as "80,000,000 MMBtus of Natural Gas . . . currently stored as recoverable cushion gas and as working gas in the Storage Facility." 1997 Participation Agreement at 1 (emphasis added). This is the gas that was pledged to BofA as security. See 1997 Security Agreement §§ 1, 3(a)(vii). When the transaction was restructured in 2001, BofA released its security in 25 Bcf (roughly equivalent to 25,000,000 MMBtus) of this gas, to be sold outright to AEP, and retained a security in the remaining 55 Bcf (approximately 55,000,000 MMBtus) of Storage Gas. See 2001 Security Agreement §§ 1, 3(a)(vii) (granting security interest in the "Pledged Gas," defined as "up to 54,999,965 MMBtus of Storage Gas present in the Bammel Storage Facility in Houston, Texas from time to time"). In the event of a default, the Guaranty grants the Trustee the

85

right to take custody of and withdraw "the aggregate quantity (in MMBtus) of Storage Gas" contained in the facility. 2001 Guaranty § 5.02(b) (emphasis added).

The document signed by BofA in the 2001 Transaction that references "cushion gas" is the Consent. In addition, the Right To Use Agreement, to which BofA was not itself a party, also refers to the gas at issue as "Cushion Gas." See Right To Use Agreement, §§ 1.01, 2.01(b). These documents, we surmise, form the foundation upon which the plaintiffs base their argument. However, the use of the term "cushion gas" in these agreements does not appear to be intended to restrict the defendants' interest in the Storage Gas. Rather, the agreements apparently refer to the gas as "cushion gas" because this is the primary use to which it was contemplated under the Operative Agreements that the Storage Gas would be put. It is for this reason that the Pressurization Agreement is entitled in full, "Pressurization and Storage Gas Borrowing Agreement": because the plaintiffs' right to use the Storage Gas was restricted primarily to keeping it in the facility for pressurization purposes -- i.e., as cushion gas -- and, from time to time, to borrowing a quantity, subject to replacement, for their own working use -- i.e., as working gas. See, e.g., 1997 Participation Agreement, at intro. ("To facilitate the transactions contemplated by this Participation Agreement, (a) [HPL and HPLR] and the Trustee are entering into the Pressurization Agreement . . . pursuant to which the Trustee will permit (i) HPL[] to use the Storage

86

Gas . . . for pressurization of the Storage Facility, and (ii) [HPL and HPLR] to borrow, replace, and reborrow the Storage Gas from time to time, in accordance with the operational requirements of the Storage Facility.").

Further, the Right To Use Agreement defines "Cushion Gas" in a manner that encompasses the entire quantity of Storage Gas then stored in the facility that would be dedicated to HPL's exclusive "quiet enjoyment," as distinguished from whatever additional quantities of "Working Gas" may be provided from outside sources to be stored in and withdrawn from the facility from time to time.  See Right To Use Agreement §§ 1.01, 2.01(a)-(b) (defining "Cushion Gas" as the natural gas currently in the Storage Facility dedicated to HPL's use, and "Working Gas" as "all Natural Gas that, from time to time, is stored in the Storage Facility that is not Cushion Gas").  While these agreements do appear to contemplate that the plaintiffs will use the Storage Gas as cushion gas -- i.e., as the base on which to pressurize the facility for the storage and withdrawal of additional gas -- such a use does not change the inherent nature of the secured property: which is natural gas.[22]

---

[22] We note, in this regard, the defendants' argument to the district court that the term "'cushion gas' does not connote a type of gas but rather a quantity of gas -- the amount needed to pressurize a facility," see AEP II, 2007 WL 4458117, at *3, 2007 U.S. Dist. LEXIS 93022, at *9 (emphasis in original), and the plaintiffs' expert's concession that natural gas is physically fungible for these two purposes.

We further agree with the district court that the Operative Agreements evinced an understanding that the Storage Gas would be readily removable from the facility, and that this gas was intended to be valued at market rates. See AEP II, 2007 WL 4458117, at *4, 2007 U.S. Dist. LEXIS 93022, at *12. The Pressurization Agreement provided for the entire quantity of Storage Gas to be withdrawn and sold in 2004 to repay the BofA loan, and the Marketing Agreement established that this gas was to be valued at the Houston Ship Channel Index price at the time of sale. The Houston Ship Channel market price for natural gas on May 14, 2004 -- the date of conversion -- was readily calculable at $6.315 per MMBtu. From this, the district court calculated the value of the approximately 55 Bcf of natural gas to be $347,325,000. Further, it is undisputed that there was, at the time of the district court's decision, 128 Bcf of gas in the facility, more than enough for the Storage Gas to be removed without creating any pressurization problems.

Accordingly, we conclude that the district court did not err in calculating the value of the natural gas on summary judgment.

E. The Calculation of Withdrawal Costs

The district court reduced the award of damages by the cost the defendants would have incurred had they withdrawn the Storage Gas in May 2004. The plaintiffs claimed a total of $18.7 million in costs, consisting of $1.65 million to withdraw the gas from the facility, $1.65 million to transport it to the Houston

88

Ship Channel, and a $15.4 million "capacity reservation fee."
The defendants contended that the withdrawal would have been
cost-free. The district court adopted the plaintiffs' suggestion
that it look to the storage and withdrawal contract between the
Storage Facility and its largest unrelated commercial storage
customer to determine a reasonable withdrawal fee, which was
three cents per MMBtu, for a total of $1.65 million. See AEP IV,
2008 WL 3338203, at *1, 2008 U.S. Dist. LEXIS 61264, at *3-*5.
The defendants do not challenge this conclusion on appeal.
However, the district court found the other purported costs
proposed by the plaintiffs to be unreasonable and declined to
credit them as a matter of law. See id., 2008 WL 3338203, at *2,
2008 U.S. Dist. LEXIS 61264, at *5-6.

Because neither party challenges on appeal the district
court's determination of the withdrawal fee at three cents per
MMBtu, we consider only the court's conclusion as a matter of law
that the plaintiffs were not entitled to reduce the award by the
cost of transportation or a capacity reservation fee. See JP
Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V., 412 F.3d
418, 428 (2d Cir. 2005) (holding that arguments not made in the
parties' opening briefs on appeal are waived). We conclude that
the district court correctly rejected an award of these costs.
As the district court concluded, the fact that the court used the
Houston Ship Channel Index price as a reasonable proxy for the
market value of the gas does not mean that the defendants would
have been required to physically transport the gas to the Houston

89

Ship Channel in order to sell it. The unrefuted evidence showed to the contrary that the defendants were entitled to delivery of the gas in the vicinity of the Storage Facility, and could have sold it there, thereby avoiding any cost of transportation. With regard to the purported "capacity reservation fee," the district court properly determined that this cost was not related in any way to the withdrawal of the Storage Gas nor found in any contract between the parties.

### V. Federal Rule 56(f) Motion to Permit Further Depositions

Finally, the plaintiffs appeal from the district court's denial of their motion pursuant to Federal Rule of Civil Procedure 56(f) to continue summary judgment proceedings in order to permit them to take the depositions of two individuals formerly affiliated with Enron, including former Enron CFO Andrew Fastow, who first became available to testify following a 2006 plea agreement finalized shortly before summary judgment. These depositions were relevant only to the plaintiffs' Tort and Contract Claims, inasmuch as the plaintiffs represented that they would be material to the question of BofA's knowledge of fraud, and not to the Declaratory Claims. Because we vacate the district court's decision as to the Tort and Contract Claims on procedural grounds, this issue is moot.

**CONCLUSION**

For the foregoing reasons, we vacate the district court's grant of summary judgment to BofA with respect to the Tort and Contract Claims, concluding that these claims and the related counterclaims should be adjudicated in Texas. We affirm the district court's judgment in all other respects.